# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

GABRIELLA SILER, a minor,
by her mother and guardian, Ikesha King,
and ESTATE OF AARON SILER,
by Special Administrator, Lisa Cerna,

      Plaintiffs,

v.                                  Case No.:17-CV-1324

CITY OF KENOSHA
and PAUL (PABLO) E. TORRES,

      Defendants.

---

## FEDERAL COMPLAINT

---

Plaintiffs, GABRIELLA SILER, a minor, by her mother and guardian Ikesha King, and ESTATE OF AARON SILER, by Special Administrator, Lisa Cerna, by their attorneys, Samster, Konkel & Safran, S.C. and Godin Geraghty Puntillo Camilli, S.C., for their Complaint against Defendants, CITY OF KENOSHA and PAUL (PABLO) E. TORRES, state as follows:

## INTRODUCTION

1.      This is a federal civil rights action brought by the Plaintiffs to obtain compensatory damages, punitive damages, attorneys' fees, costs and equitable relief for the serious personal injuries and resulting death of Aaron Siler. On March 14, 2015, Kenosha Police Department Officer Paul (Pablo) E. Torres used excessive force against Mr. Siler when he shot Mr. Siler six times. The conduct of Officer Torres and the constitutional rights violation suffered by Mr. Siler occurred as a direct result of the City of Kenosha's unconstitutional policies.

## JURISDICTION AND VENUE

### Jurisdiction

2.      This action arises under the Fourth and Fourteenth Amendments to the United States Constitution and Title 42 of the United States Code, Section 1983. Jurisdiction of the Court is conferred by Title 28 of the United States Code, Sections 1331 and 1343(a)(3) and (4).

### Venue

3.      The Eastern District of Wisconsin is the proper federal venue for this action, pursuant to Title 28 of the United States Code, Section 1391(b), because it is judicial district where the constitutional rights violation suffered by Aaron Siler occurred.

## PARTIES

### Plaintiffs

4.     Plaintiff, Gabriella Siler, is a minor and the biological child of Aaron Siler, deceased. At all times material hereto, Plaintiff, Gabriella Siler, has been residing at her address in the City of Kenosha, State of Wisconsin, with her biological mother, Ikesha King. Plaintiff, Gabriella Siler, proceeds in this action through her mother and guardian, Ikesha King.

5.     Plaintiff, Estate of Aaron Siler, proceeds in this action through its Special Administrator, Lisa Cerna, who was appointed by the Kenosha County Circuit Court Probate Division on September 11, 2017.

6.     Aaron Siler was killed on March 14, 2015, and was 26 years of age at the time he was killed. At all times material hereto, Aaron Siler was a permanent resident in the City of Kenosha, State of Wisconsin.

### Defendants

7.     Defendant, the City of Kenosha ("Kenosha"), at all times material hereto, was a municipal corporation, organized and existing under the laws of the State of Wisconsin, whose principal offices are located at City Hall, 625 52nd Street, City of Kenosha, State of Wisconsin, 53140.

8.     Defendant, Paul (Pablo) E. Torres ("Torres"), upon information and belief, at all times material hereto, was an adult resident of the City of Kenosha, State of Wisconsin, and was a Kenosha Police Department ("KPD") officer employed by Kenosha. At all times material hereto, Torres was acting under color of law, was

carrying out his duties as a KPD officer, and was acting within the scope of his employment with Kenosha.

## FACTS

### Kenosha's Unconstitutional Policies

9.     There is a long, tragic history of a widespread pattern of constitutional rights violations committed by KPD officers.

10.     One of the latest victims of the widespread pattern of constitutional rights violations committed by KPD officers is Aaron Siler, who suffered a fatal use of excessive force.

11.     The moving force behind the widespread pattern of constitutional rights violations committed by KPD officers, including the violation suffered by Aaron Siler, are the unconstitutional policies of Kenosha including: (a) the deficient hiring and retention policy; (b) the failure to train policy; (c) the failure to discipline policy; and (d) the custom of condoning constitutional rights violations.

### Deficient Hiring and Retention Policy

12.     The Common Council of the City of Kenosha, the City of Kenosha Police and Fire Commission, and/or the KPD Chief of Police are the policy-makers for Kenosha with respect to the hiring and retention of KPD officers.

13.     Kenosha hired Torres as a KPD officer on March 25, 1996.

14.     Upon information and belief, prior to March 25, 1996 and continuing to the present, it was/is the policy of Kenosha to not conduct any psychological testing of police officer candidates.

4

15.     In September 1987, the Journal of Police Science and Administration, a publication of the International Association of Chiefs of Police, included an article titled "Psychological Screening of Police Candidates: Current Perspectives."

16.     A copy of the article titled "Psychological Screening of Police Candidates: Current Perspectives," published in the Journal of Police Science and Administration in September 1987, is attached to this Federal Complaint as Exhibit A, and is incorporated as part of this Federal Complaint.

17.     Upon information and belief, Kenosha had actual and/or constructive notice of Exhibit A and its contents in September 1987, or shortly thereafter.

18.     Exhibit A contains many facts regarding the psychological testing of police officers, as will be set forth in the subsequent paragraphs.

19.     In 1967, the President's Commission on Law Enforcement and the Administration of Justice stated that "psychological tests . . . to determine emotional stability should be conducted in all [police] departments." (Exhibit A at p.210).

20.     In 1967, the National Advisory Commission on Criminal Standards and Goals stated that:

> Police officers are subject to great emotional stress and they are placed in positions of trust. For these reasons, they should be very carefully screened to preclude the employment of those who are emotionally unstable, brutal, or who suffer any form of emotional illness. A growing number of police agencies have turned to psychological screening to eliminate those who are emotionally or otherwise unfit for the police service.

5

(Exhibit A at p.210).

21.     In 1967, the National Advisory Commission on Criminal Standards and Goals issued the following recommendation: "Every police agency, by 1975, should retain the services of a qualified psychiatrist or psychologist to conduct psychological testing of police applicants to screen out those who have mental disorders or are emotionally unfit for police work." (Exhibit A at p.210).

22.     In 1986, International Association of Chiefs of Police President John J. Norton stated that "psychological services are now recognized as a vital component for a well-run and responsible [police] department." (Exhibit A at p.210).

23.     In 1977, a book titled "The Police Personnel Selection Process" stated the following:

> [L]aw enforcement agencies are under a heavy obligation to improve their techniques for detecting the high-risk applicant before hire. A high-risk applicant is one whose psychological make-up is such that he will quite likely be unable to cope with the responsibilities and authority inherent in the position of police officer. The responsibility is placed more and more directly on the police agency to include a program of psychological testing aimed at screening-out applicants who potentially represent a risk to the public, to fellow officers, or to themselves.

(Exhibit A at p.212).

24.     In 1983, an article titled "A process for screening out law enforcement candidates who might break under stress" stated that psychological testing of police officer applicants would screen out candidates with "such personal attributes as excessive fearfulness, phobias, uncontrolled impulsivity, inability to handle hostility, self-destructive behaviors, paranoid tendencies, and delusional

6

thinking, as well as clearly psychotic conditions and character disorders." (Exhibit A at p.212).

25. In 1980, an article titled "Police officer selection in the medium-sized department" stated the following:

> [T]he psychological examination provides an excellent balance for the oral interview and polygraph examination, and is principally of value in identifying the person who is clearly not suited to police employment. This phase of testing appears to be critical in terms of negating liability where charges of negligent admission might arise as a result of misconduct of an officer following employment.

(Exhibit A at p.212).

26. The article titled "Psychological Screening of Police Candidates: Current Perspectives" stated the following with respect to the clinical interview portion of pre-employment psychological testing of police officer candidates:

> While the information from tests and inventories is essential and tends to be more objective than other sources, there is also a need for a more individualized, in-depth method of assessing the candidate. Specific areas of concern can be probed by a professional trained in the identification of emotional and psychological difficulties. Face-to-face observation of the individual's behavior can be a valuable component when the psychologist must make critical decisions. Most psychologists feel that no candidate should be eliminated from consideration for a job based on written psychological tests alone. The clinical interview is a critical step in the screening process.

(Exhibit A at pp.212-213).

27. In October 1994, the United States Department of Justice, National Institute of Justice, issued a Report titled "Controlling Police Use of Excessive Force: The Role of the Police Psychologist," by Ellen M. Scrivner, Ph.D.

7

28.     A copy of the United States Department of Justice, National Institute of Justice, Report titled "Controlling Police Use of Excessive Force:  The Role of the Police Psychologist," by Ellen M. Scrivner, Ph.D., dated October 1994, is attached to this Federal Complaint as Exhibit B, and is incorporated as part of this Federal Complaint.

29.     Upon information and belief, Kenosha had actual and/or constructive notice of Exhibit B and its contents in October 1994, or shortly thereafter.

30.     The United States Department of Justice, National Institute of Justice, recognized that police departments have conducted psychological testing of police officer candidates since the 1980's. (Exhibit B at p.1).

31.     The United States Department of Justice, National Institute of Justice, stated that psychological testing and clinical interviews are tools which "are valid and reliable measurements" and are "used to prevent problem behaviors, including use of excessive force." (Exhibit B at p.4).

32.     Complete psychological testing of police officer candidates consists of: (a) requiring candidates to take a written psychological test and (b) requiring candidates to participate in a clinical interview conducted by a psychologist or psychiatrist.

33.     Upon information and belief, prior to March 25, 1996 and continuing to the present, Kenosha made/makes a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that such testing

would preclude the employment of some candidates who were emotionally unstable, brutal and/or who suffered from emotional illness.

34.     Upon information and belief, prior to March 25, 1996 and continuing to the present, Kenosha made/makes a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that such testing would screen out some candidates who had mental disorders and/or who were emotionally or otherwise unfit for police work.

35.     Upon information and belief, prior to March 25, 1996 and continuing to the present, Kenosha made/makes a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that such testing would detect some candidates whose psychological make-up makes them high risk because they are unable to cope with the responsibilities and authority inherent in the position of police officer.

36.     Upon information and belief, prior to March 25, 1996 and continuing to the present, Kenosha made/makes a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that such testing would screen out some candidates who present a risk to the public, their fellow police officers and themselves.

37.     Upon information and belief, prior to March 25, 1996 and continuing to the present, Kenosha made/makes a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that such testing would screen out some candidates with excessive fearfulness, phobias,

uncontrolled impulsivity, inability to handle hostility, self-destructive behaviors, paranoid tendencies, delusional thinking, psychotic conditions and character disorders.

38.     Upon information and belief, prior to March 25, 1996 and continuing to the present, Kenosha made/makes a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that the failure to conduct such testing could lead to liability for police officer misconduct.

39.     Upon information and belief, prior to March 25, 1996 and continuing to the present, Kenosha made/makes a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that the National Advisory Commission on Criminal Standards and Goals recommended that every police agency, by 1975, should conduct psychological testing of police officer candidates to screen out some candidates who have mental disorders or are emotionally unfit for police work.

40.     Upon information and belief, prior to March 25, 1996 and continuing to the present, Kenosha made/makes a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that police departments have been conducting psychological testing of police officer candidates since the 1980's.

41.     Upon information and belief, prior to March 25, 1996 and continuing to the present, Kenosha made/makes a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that such testing

is a valid and reliable measurement and is used to prevent problem behaviors by police officers, including the use of excessive force.

42. Upon information and belief, prior to March 25, 1996 and continuing to the present, Kenosha made/makes a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that such testing is the only method to screen out candidates who are capable of pathological or abnormal patterns of behavior.

43. Upon information and belief, prior to March 25, 1996 and continuing to the present, Kenosha made/makes a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that such testing would screen out some candidates who would commit constitutional rights violations.

44. Upon information and belief, prior to March 25, 1996 and continuing to the present, Kenosha made/makes a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that it is important that police officers are mentally fit because they are authorized to carry firearms which can cause death or serious bodily injury.

45. Upon information and belief, prior to March 25, 1996 and continuing to the present, Kenosha made/makes a deliberate choice to not conduct complete psychological testing of police officer candidates despite knowing that it is necessary to determine a police officer's mental fitness to perform the duties of a

Case 2:17-cv-01324-PP   Filed 09/28/17   Page 11 of 68   Document 1

police officer so as to reduce or eliminate the risk of the police officer becoming a danger to the general public.

46.     Upon information and belief, Kenosha hired Torres as a KPD officer without conducting any psychological testing, despite knowing the benefits of conducting such testing and the risks of not conducting such testing, as set forth in the preceding paragraphs.

47.     Kenosha has allowed Torres to remain employed with the KPD, including promoting Torres to the rank of detective, possibly without conducting any psychological testing, despite knowing the benefits of conducting such testing and the risks of not conducting such testing, as set forth in the preceding paragraphs.

48.     Kenosha has allowed Torres to remain employed with the KPD, including promoting Torres to the rank of detective, possibly without conducting any psychological testing, despite knowing about several incidents which tend to indicate that Torres may be dangerous to the general public, as will be set forth in subsequent paragraphs.

49.     The policies of Kenosha, with respect to the failure to conduct psychological testing of KPD officer candidates, were the moving force behind the constitutional rights violations suffered by Aaron Siler.

50.     The policies of Kenosha, with respect to the failure to conduct any psychological testing of Torres, were the moving force behind the constitutional rights violations suffered by Aaron Siler.

Case 2:17-cv-01324-PP   Filed 09/28/17   Page 12 of 68   Document 1

51.     The actions and/or inactions of Torres during his employment with the KPD and during the encounter with Aaron Siler on March 14, 2015, as will be set forth in the subsequent paragraphs, upon information and belief, show that Torres would have been screened out as a KPD officer candidate had Kenosha conducted psychological testing of Torres.

52.     Upon information and belief, had Kenosha conducted psychological testing of Torres, he would not have been hired by Kenosha and/or would not have remained employed, and, as a result, the constitutional rights violation suffered by Aaron Siler would not have occurred.

53.     Upon information and belief, prior to March 25, 1996 and continuing to the present, it was/is the policy of Kenosha to not conduct adequate background checks of police officer candidates.

54.     Upon information and belief, prior to March 25, 1996 and continuing to the present, Kenosha made/makes a deliberate choice to not conduct adequate background checks of police officer candidates despite knowing that such checks would screen out some candidates who would commit constitutional violations, including the use of excessive force.

55.     Prior to being hired by Kenosha as a KPD officer, Torres was a police officer with the Winthrop Harbor, Illinois Police Department.

56.     At the time he applied to the KPD, Torres claimed to be employed by the Winthrop Harbor, Illinois Police Department.

57.     Upon information and belief, contrary to Torres' application to the KPD, the Winthrop Harbor, Illinois Police Department fired Torres prior to the time he applied with the KPD for being too quick to draw his gun.

58.     In his application to the KPD, Torres objected to Kenosha contacting the Winthrop Harbor, Illinois Police Department.

59.     Upon information and belief, prior to hiring Torres as a KPD officer, Kenosha failed to conduct an adequate background check of Torres and failed to discover that the Winthrop Harbor, Illinois Police Department fired Torres for being too quick to draw his gun.

60.     Upon information and belief, had Kenosha conducted an adequate background check of Torres and discovered that the Winthrop Harbor, Illinois Police Department fired Torres for being too quick to draw his gun, Torres would not have been hired by Kenosha and/or would not have remained employed, and, as a result, the constitutional rights violation suffered by Aaron Siler would not have occurred.

## Failure to Train Policy

61.     The Common Council of the City of Kenosha, the City of Kenosha Police and Fire Commission, and/or the KPD Chief of Police are the policy-makers for Kenosha with respect to the training of KPD officers.

62.     KPD officers encountering individuals who do not comply with their commands are recurring situations that present an obvious potential for constitutional rights violations.

14

63. KPD officers using force against individuals are recurring situations that present an obvious potential for constitutional rights violations.

64. Adequate training of police officers for encountering individuals who do not comply with their commands includes de-escalation training.

65. Adequate training of police officers for using force against individuals includes de-escalation training.

66. De-escalation training teaches police officers the skills and techniques needed to reduce uses of force.

67. De-escalation training teaches police officers the skills and techniques needed to stabilize situations and reduce the immediacy of threats so that more time, resources and options are available to eliminate the necessity to use force and/or to reduce the force necessary to resolve a situation.

68. De-escalation training teaches police officers verbal de-escalation skills and techniques, such as active listening, respectful listening, developing and maintaining rapport, using courteous and professional language, and persuading individuals to cooperate without using force.

69. De-escalation training teaches police officers to manage their emotions and remain calm during tactical situations.

70. De-escalation training teaches police officers to use body language that does not convey hostility.

71. De-escalation training teaches police officers to understand the benefits of slowing things down and using time to de-escalate tactical situations.

Case 2:17-cv-01324-PP   Filed 09/28/17   Page 15 of 68   Document 1

72.     Prior to March 14, 2015 and continuing to the present, Kenosha knew/knows of the benefits of de-escalation training, as set forth in the preceding paragraphs.

73.     Prior to March 14, 2015 and continuing to the present, Kenosha knew/knows that it was/is highly predictable that uses of excessive force would occur without de-escalation training of KPD officers, because there was/is a pattern of similar uses of excessive force.

74.     Prior to March 14, 2015 and continuing to the present, Kenosha knew/knows that it was/is highly predictable that uses of excessive force would occur without de-escalation training of KPD officers, even without a pattern of similar uses of excessive force.

75.     Prior to March 14, 2015 and continuing to the present, Kenosha knew/knows that de-escalation training of KPD officers was/is needed to avoid uses of excessive force.

76.     Prior to March 14, 2015 and continuing to the present, it was/is obvious to Kenosha that de-escalation training of KPD officers was/is needed to avoid uses of excessive force.

77.     Upon information and belief, prior to March 14, 2015 and continuing to the present, it was/is the policy of Kenosha to not provide de-escalation training to KPD officers.

78.     Upon information and belief, prior to March 14, 2015 and continuing to the present, Kenosha failed/fails to provide de-escalation training to Torres.

79.     Upon information and belief, prior to March 14, 2015, and continuing to the present, it was/is the policy of Kenosha to have a training program that was/is not adequate to train KPD officers to properly encounter individuals who do not comply with their commands because the program failed/fails to include de-escalation training.

80.     Upon information and belief, prior to March 14, 2015, and continuing to the present, it was/is the policy of Kenosha to have a training program that was/is not adequate to train KPD officers to properly use force against individuals because the program failed/fails to include de-escalation training.

81.     As will be set forth in the subsequent paragraphs, Torres failed to attempt to de-escalate the situation with Aaron Siler.

82.     As will be set forth in the subsequent paragraphs, Torres improperly responded to his encounter with Aaron Siler by escalating the situation several times.

83.     As will be set forth in the subsequent paragraphs, Torres improperly responded to the minimal threat of harm presented by Aaron Siler by using the excessive force of shooting Mr. Siler six times, resulting in his death.

84.      The policies of Kenosha with respect to the failure to train KPD officers, as set forth in the preceding paragraphs, were the moving force behind the constitutional rights violation suffered by Aaron Siler.

85. Upon information and belief, had Kenosha provided de-escalation training to KPD officers, including Torres, the constitutional rights violation suffered by Aaron Siler would not have occurred.

### Failure to Discipline Policy

86. The Common Council of the City of Kenosha, the City of Kenosha Police and Fire Commission, and/or the KPD Chief of Police are the policy-makers for Kenosha with respect to the discipline of KPD officers.

87. As will be set forth in subsequent paragraphs, Kenosha has a long history of failing to discipline KPD officers for misconduct, including, but not limited to, the commission of constitutional rights violations.

88. Kenosha's failures to discipline KPD officers include, but are not limited to, the events listed below.

89. In February 1998, KPD Chief of Police Daniel Wade sought the termination of KPD Officer Thomas Knight's employment with the KPD.

90. During a hearing regarding Officer Knight's termination, KPD Detective Robert Queen testified that he observed Officer Knight and two other KPD officers use excessive force while arresting a man in the summer of 1996.

91. Detective Queen testified that he observed Officer Knight repeatedly slam the man's head into a concrete sidewalk during the summer of 1996 excessive force incident.

92. Detective Queen testified that the KPD never reported or investigated the summer of 1996 excessive force incident.

93.     Officer Knight denied being involved in the summer of 1996 excessive force incident, claiming that he was at the Kenosha County Public Safety building at the time of the incident.

94.     KPD dispatch records confirmed that Officer Knight was not present during the summer of 1996 excessive force incident.

95.     Upon information and belief, the KPD failed to discipline Detective Queen for his untruthful testimony regarding Officer Knight's involvement in the summer of 1996 excessive force incident.

96.     In 2004, the State of Wisconsin charged KPD Officer Kurtiss Kessler with the crime of intentionally pointing his KPD-duty handgun at his girlfriend's head, and also with three counts of disorderly conduct and two counts of criminal damage to property.

97.     Officer Kessler pleaded guilty to two counts of disorderly conduct and one count of criminal damage to property.

98.     As part of the plea agreement, the criminal charges against Officer Kessler for intentionally pointing his KPD-duty handgun at his girlfriend's head, along with one count of disorderly conduct and one count of criminal damage to property, were dismissed, but read into the record so that the dismissed charges could be considered at Officer Kessler's sentencing.

99.     The KPD did not terminate Officer Kessler's employment after his guilty plea to three criminal charges, but instead only suspended Officer Kessler for 55 days.

100.   KPD Chief of Police Daniel Wade claimed that there was nothing "legally substantial" to support the criminal charge against Officer Kessler for intentionally pointing his KPD-duty handgun at his girlfriend's head, despite the fact that the State of Wisconsin brought this charge against Officer Kessler and despite the fact that the State and Officer Kessler agreed that this charge would be considered by the Court and read into the record for sentencing purposes.

101.   KPD Chief of Police Daniel Wade did not terminate Officer Kessler's employment with the KPD due to his belief that there was nothing "legally substantial" to support the criminal charge against Officer Kessler for intentionally pointing his KPD-duty handgun at his girlfriend's head.

102.   In 2009, the State of Wisconsin again charged Officer Kessler with crimes arising from a domestic violence incident.

103.   Officer Kessler pleaded guilty to the crimes of battery and disorderly conduct as a result of the 2009 domestic violence incident.

104.   Officer Kessler resigned from the KPD on the same day that he was charged with crimes arising from the 2009 domestic violence incident.

105.   Because Officer Kessler resigned from the KPD, the KPD did not investigate or discipline Officer Kessler for the 2009 domestic violence incident.

106.   The KPD failed to adequately investigate the constitutional rights violations suffered by Michael E. Bell on November 9, 2004, as will be set forth in the subsequent paragraphs.

107. The KPD failed to discipline any KPD officer for the constitutional rights violations suffered by Michael E. Bell on November 9, 2004, as will be set forth in the subsequent paragraphs.

108. The KPD failed to discipline any KPD officer for the constitutional rights violations suffered by Keenan Smith on July 7, 2012, as will be set forth in the subsequent paragraphs.

109. The KPD failed to discipline any KPD officer for the incident with Tieshina Bey, as will be set forth in the subsequent paragraphs.

110. Prior to March 14, 2015 and continuing to the present, it was/is the policy of Kenosha to tolerate untruthfulness by KPD officers during investigations into KPD officer misconduct.

111. Prior to March 14, 2015 and continuing to the present, it was/is the policy of Kenosha to fail to properly investigate citizen complaints against KPD officers.

112. Prior to March 14, 2015 and continuing to the present, it was/is the policy of Kenosha to fail to properly conduct internal investigations regarding allegations of misconduct against KPD officers.

113. Prior to March 14, 2015 and continuing to the present, it was/is the policy of Kenosha to fail to properly investigate uses of force by KPD officers.

114. Prior to March 14, 2015 and continuing to the present, it was/is the policy of Kenosha to permit a belief among KPD officers that they can commit

constitutional rights violations without ever facing consequences for their misconduct.

115. The policies of Kenosha with respect to its failures to discipline KPD officers, as set forth in the preceding paragraphs, were the moving force behind the constitutional rights violation suffered by Aaron Siler.

116. Kenosha had actual and/or constructive notice that KPD officers were using excessive force against individuals prior to March 14, 2015.

117. Despite having actual and/or constructive notice that KPD officers were using excessive force against individuals, Kenosha took no action to discipline the KPD officers involved.

118. As a result of Kenosha's failure to discipline the KPD officers involved in using excessive force against individuals, Kenosha allowed the uses of excessive force to continue, including the use of excessive force suffered by Aaron Siler.

119. Torres used excessive force against Aaron Siler because, prior to March 14, 2015, Torres had not been disciplined for similar misconduct.

120. Torres used excessive force against Aaron Siler because, prior to March 14, 2015, other KPD officers had not been disciplined for similar misconduct.

121. Had Kenosha not failed to discipline Torres and other KPD officers for uses of excessive force, the use of excessive force suffered by Aaron Siler would not have happened.

122.    Upon information and belief, Kenosha presently maintains a policy of failing to discipline KPD officers for engaging in misconduct, including, but not limited to, uses of excessive force.

### Custom of Condoning Constitutional Rights Violations

123.    Prior to March 14, 2015 and continuing to the present, Kenosha maintained/maintains a custom of condoning constitutional rights violations by KPD officers.

124.    This custom of condoning constitutional rights violations by KPD officers was/is so persistent and widespread that it was/is the official policy and/or the standard operating procedure of Kenosha.

125.    Part of Kenosha's custom of condoning constitutional rights violations by KPD officers was/is the failure to discipline KPD officers for misconduct, as set forth in the preceding paragraphs.

126.    Part of Kenosha's custom of condoning constitutional rights violations by KPD officers was/is the code of silence within the KPD, where KPD officers do not report the misconduct of their fellow officers out of fear of retaliation.

127.    Part of Kenosha's custom of condoning constitutional rights violations by KPD officers was/is the institutional culture of untruthfulness within the KPD, where KPD command staff, supervisors and officers dishonestly cover-up the misconduct of KPD officers.

128. Part of Kenosha's custom of condoning constitutional rights violations by KPD officers was/is the institutional culture of intimidation, where KPD supervisors discourage KPD officers from opposing practices and actions that may violate constitutional rights.

129. Part of Kenosha's custom of condoning constitutional rights violations by KPD officers was/is the actions of KPD supervisors and officers in the concealment of evidence, the falsification of testimony and/or the falsification of police reports in criminal prosecutions.

130. Prior to March 14, 2015 and continuing to the present, Kenosha had/has actual and/or constructive notice of the custom of condoning constitutional rights violations by KPD officers.

131. Kenosha's custom of condoning constitutional rights violations by KPD officers was the moving force behind the constitutional rights violation suffered by Aaron Siler.

132. Had Kenosha not maintained a custom of condoning constitutional rights violations, the constitutional rights violation suffered by Aaron Siler would not have occurred.

### Widespread Pattern of Constitutional Violations

133. There is a long history of constitutional rights violations committed by KPD officers that were caused by the policies and customs of Kenosha.

134. Kenosha's long history of constitutional rights violations includes, but is not limited to, the events listed below.

*False Arrest of Jose Deanda*

135.    In 1999, KPD Officer Peter Falk arrested Jose Deanda for cocaine possession.

136.    Officer Falk claimed to have witnessed Jose Deanda spitting out a package of cocaine.

137.    Jose Deanda denied ever having possession of the cocaine that Officer Falk claimed he spit out of his mouth.

138.    DNA testing confirmed that Jose Deanda's DNA was not on the package of cocaine.

139.    The State of Wisconsin dismissed the charges against Jose Deanda pertaining to the alleged cocaine possession.

140.    As a result of a lawsuit he filed, Jose Deanda received $75,000 as compensation for his false arrest by the KPD.

141.    Upon information and belief, Officer Falk has engaged in a pattern of falsifying allegations to obtain criminal convictions.

*Excessive Force against Lloyd King*

142.    In 2002, KPD Officers Peter Falk and Keith Dumesic arrested Lloyd King for drug-related offenses.

143.    Officer Falk and Officer Dumesic simultaneously used pepper spray and a Taser stun gun on Lloyd King, which caused Mr. King's face to ignite due to the combination of the alcohol from the pepper spray and the electric current from the Taser stun gun.

25

144. In their KPD reports regarding the incident, Officer Falk and Officer Dumesic claimed that they used the Taser stun gun only once on Lloyd King; and that they used the Taser stun gun prior to using the pepper spray on Mr. King.

145. The Taser stun gun revealed that, contrary to their KPD reports, Officer Falk and Officer Dumesic used the Taser stun gun multiple times against Lloyd King.

146. Officer Falk and Officer Dumesic used excessive force against Lloyd King.

147. As a result of a lawsuit he filed, Lloyd King received $75,000 for his injuries caused by Officer Falk and Officer Dumesic.

*Unlawful Stop and Excessive Force against Michael E. Bell*

148. On November 9, 2004, KPD Officers Erich Strausbaugh and Erich Weidner stopped Michael E. Bell as he was lawfully operating a vehicle.

149. Officer Strausbaugh and Officer Weidner stopped Michael E. Bell in front of Mr. Bell's residence.

150. At the time they stopped Michael E. Bell, Officer Strausbaugh and Officer Weidner did not have reasonable suspicion to believe that Mr. Bell had committed, was committing or was about to commit a crime or traffic offense.

151. After Michael E. Bell made no attempt to flee Officer Strausbaugh and Officer Weidner and stopped the vehicle he was operating, Mr. Bell's passenger exited the vehicle, followed by Mr. Bell.

152.   After Michael E. Bell exited the vehicle and walked slowly along the side of the vehicle, Officer Strausbaugh approached Mr. Bell, placed his right hand on Mr. Bell's throat and pushed Mr. Bell.

153.   At the time Officer Strausbaugh placed his right hand on Michael E. Bell's throat and pushed Mr. Bell, there was no imminent threat to Officer Strausbaugh's or anyone else's safety, and Mr. Bell was not actively resisting Officer Strausbaugh.

154.   Officer Strausbaugh used excessive force against Michael E. Bell by placing his right hand on Mr. Bell's throat and pushing Mr. Bell.

155.   When Michael E. Bell asked why he was being stopped, either Officer Strausbaugh or Officer Weidner told Mr. Bell that he had failed to stop at a stop sign.

156.   Contrary to the statement made to Michael E. Bell, both Officer Strausbaugh and Officer Weidner knew that Mr. Bell had in fact stopped at the stop sign.

157.   After Michael E. Bell began to walk towards his residence, Officer Strausbaugh and Officer Weidner grabbed Mr. Bell and tripped Mr. Bell to the ground.

158.   After Michael E. Bell fell to the ground on his stomach, Officer Strausbaugh and/or Officer Weidner kicked Mr. Bell and delivered knee strikes to Mr. Bell's ribs.

Case 2:17-cv-01324-PP   Filed 09/28/17   Page 27 of 68   Document 1

159. At the time Officer Strausbaugh and/or Officer Weidner kicked Michael E. Bell and delivered knee strikes to Mr. Bell's ribs, there was no imminent threat to Officer Strausbaugh's, Officer Weidner's or anyone else's safety, and Mr. Bell was not actively resisting Officer Strausbaugh or Officer Weidner.

160. Officer Strausbaugh and Officer Weidner used excessive force against Michael E. Bell by kicking Mr. Bell and delivering knee strikes to Mr. Bell's ribs.

161. Officer Weidner placed handcuffs on Michael E. Bell while Mr. Bell was on the ground.

162. After placing handcuffs on Michael E. Bell, who was on the ground, Officer Weidner stood up.

163. After Michael E. Bell got to his knees, Officer Strausbaugh fired a Taser stun gun at Mr. Bell.

164. At the time Officer Strausbaugh fired the Taser stun gun at Michael E. Bell, there was no imminent threat to Officer Strausbaugh's or anyone else's safety, and Mr. Bell was not actively resisting Officer Strausbaugh.

165. Officer Strausbaugh used excessive force against Michael E. Bell by firing the Taser stun gun at Mr. Bell.

166. After Officer Strausbaugh fired the Taser stun gun at Michael E. Bell, Mr. Bell ran towards the driveway of his residence.

167. Officer Strausbaugh and Officer Weidner again took Mr. Bell down to the ground on the driveway of his residence.

168.    After Officer Strausbaugh and Officer Weidner again took Michael E. Bell down to the ground, Officer Strausbaugh and Officer Weidner kneed, kicked and thrust their elbows into Mr. Bell.

169.    At the time Officer Strausbaugh and/or Officer Weidner kneed, kicked and thrust their elbows into Michael E. Bell, Mr. Bell's hands were behind his back because he was in handcuffs.

170.    At the time Officer Strausbaugh and/or Officer Weidner kneed, kicked and thrust their elbows into Michael E. Bell, there was no imminent threat to Officer Strausbaugh's, Officer Weidner's or anyone else's safety, and Mr. Bell was not actively resisting Officer Strausbaugh or Officer Weidner.

171.    Officer Strausbaugh and Officer Weidner used excessive force against Michael E. Bell by kneeing, kicking and thrusting their elbows into Mr. Bell.

172.    After Officer Strausbaugh and/or Officer Weidner kneed, kicked and thrust their elbows into Michael E. Bell, KPD Lieutenant David Krueger arrived on the scene.

173.    Lieutenant Krueger fired a Taser stun gun at Michael E. Bell.

174.    At the time Lieutenant Krueger fired the Taser stun gun at Michael E. Bell, there was no imminent threat to Lieutenant Krueger's or anyone else's safety, and Mr. Bell was not actively resisting Lieutenant Krueger.

175.    Lieutenant Krueger used excessive force against Michael E. Bell by firing the Taser stun gun at Mr. Bell.

176.   After Lieutenant Krueger fired a Taser stun gun at Michael E. Bell, the KPD officers pushed Mr. Bell towards the left side of a vehicle that was parked in the driveway.

177.   The KPD officers threw Michael E. Bell over the hood of the vehicle with such force that they dented the left wheel well of the vehicle and broke the driver's side mirror.

178.   Michael E. Bell's body was bent over the hood of the vehicle face down, with his chest on the hood of the vehicle.

179.   As Michael E. Bell's body was bent over the hood of the vehicle, Lieutenant Krueger held Mr. Bell in a bear hug.

180.   As Michael E. Bell's body was bent over the hood of the vehicle, Officer Strausbaugh was on Mr. Bell's left side.

181.   As Michael E. Bell's body was bent over the hood of the vehicle, KPD Officer Albert Gonzales arrived on the scene.

182.   As Officer Gonzales ran towards Michael E. Bell, Officer Gonzales already had his gun drawn.

183.   As Officer Gonzales was running towards Michael E. Bell with his gun drawn, Officer Strausbaugh yelled that Mr. Bell was going for his gun.

184.   Michael E. Bell could not have been going for Officer Strausbaugh's gun, because Mr. Bell's hands were still behind his back and in handcuffs.

185.   Officer Strausbaugh's gun never left its holster.

186.    No traces of Michael E. Bell's DNA or fingerprints were found on Officer Strausbaugh's gun holster.

187.    Officer Strausbaugh's gun holster was likely caught in the control cables of the broken side view mirror against which Officer Strausbaugh was leaning.

188.    Because Officer Gonzales was on Michael E. Bell's right side, Officer Gonzalez was in a physical position to see and know that Officer Strausbaugh's gun never left its holster.

189.    After Officer Strausbaugh erroneously claimed that Michael E. Bell was going for his gun, an unidentified KPD officer yelled "shoot, shoot!"

190.    Officer Gonzales then went in between Lieutenant Krueger and Officer Strausbaugh, and shot Michael E. Bell in the head, killing Mr. Bell.

191.    Prior to shooting and killing Michael E. Bell, Officer Gonzales did not warn Mr. Bell that he was going to shoot.

192.    At the time Officer Gonzales shot Michael E. Bell in the head and killed him, there was no imminent threat of death or great bodily harm to Officer Gonzales or anyone else presented by Mr. Bell.

193.    Officer Gonzalez used excessive force against Michael E. Bell by shooting Mr. Bell in the head and killing him.

*The KPD Cover-Up of the Shooting and Killing of Michael E. Bell*

194.    After the shooting and killing of Michael E. Bell, the KPD did not separate Officer Strausbaugh, Officer Weidner, Lieutenant Krueger and Officer

Gonzales, and they were allowed to remain together for approximately three hours before being questioned about the shooting and killing of Mr. Bell.

195.    Allowing Officer Strausbaugh, Officer Weidner, Lieutenant Krueger and Officer Gonzales to remain together for three hours prior to being questioned about the shooting and killing of Michael E. Bell violated KPD policy, which provides that witnesses should be kept separate to prevent the witnesses from speaking and comparing what they observed.

196.    After allowing Officer Strausbaugh, Officer Weidner, Lieutenant Krueger and Officer Gonzales to remain together for three hours, the KPD finally interviewed them.

197.    During his KPD interview, Lieutenant Krueger claimed that Officer Gonzales shot Michael E. Bell in the left side of the head.

198.    During his KPD interview, Lieutenant Krueger claimed that Officer Gonzales' gun was pointing towards the windshield of the vehicle upon which Michael E. Bell was pinned and pointed away from the KPD officers.

199.    During his KPD interview, Officer Gonzales also claimed that his gun was pointing towards the vehicle windshield and away from the KPD officers when he shot Michael E. Bell in the head.

200.    After interviewing Officer Strausbaugh, Officer Weidner, Lieutenant Krueger and Officer Gonzales, the KPD created a video re-enactment of the incident consistent with their statements.

Case 2:17-cv-01324-PP   Filed 09/28/17   Page 32 of 68   Document 1

201. Within only 48 hours of the incident, the KPD determined that the use of force against Michael E. Bell was proper, that the shooting of Mr. Bell was justified, and that Officer Strausbaugh, Officer Weidner, Lieutenant Krueger and Officer Gonzales had not engaged in any misconduct.

202. It was not possible to adequately investigate the incident involving the police officer shooting and killing Michael E. Bell within 48 hours.

203. The KPD completed its investigation into the shooting and killing of Michael E. Bell within 48 hours without speaking to witnesses, while still waiting for the report from the Wisconsin State Crime Lab, and by only accepting the version of events claimed by Officer Strausbaugh, Officer Weidner, Lieutenant Krueger and Officer Gonzales.

204. The family of Michael E. Bell filed a civil lawsuit against Officer Strausbaugh, Officer Weidner, Lieutenant Krueger, Officer Gonzales, the KPD and the City of Kenosha for the constitutional rights violations suffered by Mr. Bell.

205. Discovery in the Bell family's lawsuit revealed the extent of the KPD cover-up in the shooting and killing of Michael E. Bell, as will be set forth in the subsequent paragraphs.

206. The report from the autopsy of Michal E. Bell confirmed that Mr. Bell had in fact been shot in the right side of the head, not in the left side of the head as claimed by Lieutenant Krueger and as shown in the KPD video re-enactment.

207. After being informed that the autopsy report showed that Michael E. Bell had been shot in the right side of the head, Lieutenant Krueger abandoned his claim that Mr. Bell was shot in the left side of the head and testified in a deposition that Officer Gonzales shot Mr. Bell in the right side of the head.

208. Officer Gonzales admitted in discovery responses that: (a) he shot Michael E. Bell in the right side of the head; (b) he was at the front of the vehicle when he shot Mr. Bell; and (c) his gun was pointing towards the vehicle windshield when he shot Mr. Bell.

209. It was impossible for Officer Gonzales to have shot Michael E. Bell in the right side of the head, while Mr. Bell was bent face down over the hood of the vehicle and while Officer Gonzales was standing at the front of the vehicle with his gun pointing towards the windshield of the vehicle.

210. After being informed that the autopsy report showed that Michael E. Bell had been shot in the right side of the head, Officer Strausbaugh, Officer Weidner, Lieutenant Krueger and Officer Gonzales created a second video re-enactment of the incident.

211. Officer Strausbaugh, Officer Weidner, Lieutenant Krueger and Officer Gonzales performed the second re-enactment three times, but recorded it only once.

212. The second video re-enactment of the shooting and killing of Michael E. Bell created by Officer Strausbaugh, Officer Weidner, Lieutenant Krueger and Officer Gonzales contradicted Officer Gonzales' earlier statements.

213. The second video re-enactment of the shooting and killing of Michael E. Bell created by Officer Strausbaugh, Officer Weidner, Lieutenant Krueger and Officer Gonzales also contradicted the forensic and physical evidence from the incident.

214. Officer Gonzales created a third video re-enactment of the shooting and killing of Michael E. Bell, which focused on the position of Officer Gonzales' gun when he shot and killed Michael E. Bell.

215. Officer Gonzales' third re-enactment of the shooting and killing of Michael E. Bell contradicted Officer Gonzales' earlier statements, the second video re-enactment and the report from the autopsy of Mr. Bell.

216. KPD Chief of Police Daniel Wade knew that Officer Strausbaugh, Officer Weidner, Lieutenant Krueger and Officer Gonzales presented multiple versions of the shooting and killing of Michael E. Bell that contradicted the forensic and physical evidence.

217. Despite Chief Wade's knowledge that Officer Strausbaugh, Officer Weidner, Lieutenant Krueger and Officer Gonzales presented multiple versions of the shooting and killing of Michael E. Bell that contradicted the forensic and physical evidence, Chief Wade claimed that Officer Strausbaugh, Officer Weidner, Lieutenant Krueger and Officer Gonzales acted consistent with KPD policy and procedure during the incident with Mr. Bell.

*Excessive Force against Daniel Wilson*

218.    In May 2011, KPD Officer Susan Webb arrested Daniel Wilson during a domestic dispute.

219.    When he was arrested, Daniel Wilson told Officer Webb that he recently had back surgery.

220.    Officer Webb used one set of handcuffs on Daniel Wilson instead of two, causing injury to Mr. Wilson's back.

221.    Officer Webb forced Daniel Wilson to walk quickly to a KPD squad car, pushed Mr. Wilson across the back seat of the squad car, and twisted and contorted Mr. Wilson's legs, causing injury to Mr. Wilson's back.

222.    Officer Webb used excessive force against Daniel Wilson when she placed Mr. Wilson inside the KPD squad car.

*Excessive Force against Keenan Smith*

223.    On July 7, 2012, KPD Officer Brian Ruha fired a Taser stun gun at Keenan Smith.

224.    At the time Officer Ruha fired the Taser stun gun at Keenan Smith, there was no imminent threat to Officer Ruha's or anyone else's safety, and Mr. Smith was not actively resisting Officer Ruha.

225.    Officer Ruha used excessive force against Keenan Smith by firing the Taser stun gun at Mr. Smith.

226.   In a KPD report regarding the July 7, 2012 Keenan Smith incident, Officer Ruha claimed that Mr. Smith was actively fighting with another man and that Mr. Smith and the other man were hitting each other with fists when Officer Ruha arrived on the scene.

227.   Video from Officer Ruha's KPD squad car showed that, contrary to Officer Ruha's report, Keenan Smith and the other man were neither actively fighting nor hitting each other with fists when Officer Ruha arrived on the scene.

228.   In a KPD report regarding the July 7, 2012 Keenan Smith incident, Officer Ruha claimed that Mr. Smith squared up to him, making Officer Ruha believe that Mr. Smith was going to fight with him.

229.   Video from Officer Ruha's KPD squad car showed that, contrary to Officer Ruha's report, Keenan Smith did not square up to Officer Ruha and that there was no reason for Officer Ruha to believe that Mr. Smith was going to fight with him.

230.   After the contradictions between Officer Ruha's KPD report regarding the July 7, 2012 Keenan Smith incident and the KPD squad car video were brought to the attention of the Kenosha Police and Fire Commission ("PFC"), the PFC ordered KPD Chief of Police John Morrissey to review the incident.

231.   Chief Morrissey provided a written report to the PFC regarding the July 7, 2012 Keenan Smith incident, dated February 18, 2013.

232. In his February 18, 2013 written report to the PFC, Chief Morrissey claimed that the July 7, 2012 Keenan Smith incident was subject to "independent" review by two experts from outside the KPD, Randall Revling and Charles Joyner.

233. In his February 18, 2013 written report to the PFC, Chief Morrissey presented Randall Revling's and Charles Joyner's claim that Officer Ruha's firing of the Taser stun gun at Keenan Smith was an appropriate use of force.

234. In his February 18, 2013 written report to the PFC, Chief Morrissey presented Charles Joyner's claim that there were no discernable discrepancies between Officer Ruha's KPD report and the KPD squad car video.

235. In his February 18, 2013 written report to the PFC, Chief Morrissey presented nothing from Charles Joyner addressing the discrepancies between Officer Ruha's KPD report and the KPD squad car video regarding Keenan Smith allegedly fighting with another man and Mr. Smith allegedly squaring up to Officer Ruha as if he was going to fight.

236. In his February 18, 2013 written report to the PFC, Chief Morrissey presented Randall Revling's claim that the KPD squad video camera was obstructed during the July 7, 2012 Keenan Smith incident.

237. In his February 18, 2013 written report to the PFC, Chief Morrissey presented nothing from Randall Revling explaining how the KPD squad car video camera was allegedly obstructed or how the alleged obstruction explained the discrepancies between Officer Ruha's KPD report and the KPD squad car video

regarding Keenan Smith allegedly fighting with another man and Mr. Smith allegedly squaring up to Officer Ruha as if he was going to fight.

238.    Upon information and belief, the reviews of the July 7, 2012 Keenan Smith incident by Charles Joyner and Randall Revling were not in fact "independent," because Chief Morrissey requested changes to the reviews, had direct input in the review process and influenced the final content of the reviews.

239.    Upon information and belief, Chief Morrissey kept the "independent" reviews of the July 7, 2012 Keenan Smith incident by Charles Joyner and Randall Revling a secret until KPD officers completed their reviews and could compare their reviews to the "independent" reviews.

240.    Upon information and belief, Chief Morrissey used his personal cell phone and his personal e-mail to communicate with Charles Joyner and Randall Revling, for the stated purpose of evading Wisconsin's open records laws.

241.    The PFC accepted Chief Morrissey's February 18, 2013 written report regarding the July 7, 2012 Keenan Smith incident.

*Excessive Force against Tieshina Bey*

242.    On October 6, 2014, KPD Officer Bridgette Heid arrested Tieshina Bey for disorderly conduct.

243.    Officer Heid placed her hands around Tieshina Bey's neck while putting Ms. Bey in a KPD squad car.

244.    Tieshina Bey was handcuffed at the time that Officer Heid put her hands around Ms. Bey's neck.

245. Officer Heid's KPD report regarding the incident with Tieshina Bey does not mention Officer Heid placing her hands around Ms. Bey's neck.

246. The KPD determined that Officer Heid acted appropriately during the incident with Tieshina Bey.

247. The KPD claimed that Officer Heid was not choking Tieshina Bey when she put her hands around Ms. Bey's neck, but instead was using a pressure point technique to gain Ms. Bey's compliance.

248. The proper police technique for gaining a person's compliance using a pressure point technique on their neck includes stabilizing the person's head to create an effective pressure point.

249. Officer Heid did not stabilize Tieshina Bey's head when she allegedly used a pressure point technique on Ms. Bey's neck.

250. Officer Heid used excessive force when she put her hands around Tieshina Bey's neck.

*Excessive Force and False Police Report by KPD Officer Peter Bisciglia*

251. On January 25, 2015, KPD Officer Peter Bisciglia responded to a shoplifting complaint at a grocery store.

252. While inside the grocery store, Officer Bisciglia shoved a man twice, causing him to lose balance and fall into a display rack.

253. Officer Bisciglia did not mention his use of force set forth in the previous paragraph in his KPD report regarding the incident.

254.    Officer Bisciglia then shoved Ainsley Ball outside the grocery store, causing Mr. Ball to fall to the ground and hit his head on the sidewalk, resulting in injuries.

255.    Officer Bisciglia did not mention his use of force against Ainsley Ball in his KPD report regarding the incident.

256.    Officer Bisciglia then arrested Ainsley Ball.

257.    After he was placed in a KPD squad car, Ainsley Ball told Officer Bisciglia that his head was pounding and that he had diabetes.

258.    Officer Bisciglia failed to provide medical attention to Ainsley Ball, despite knowing that Mr. Ball had hit his head on the sidewalk and complained about pain in his head.

259.    A KPD supervisor discovered Officer Bisciglia's use of force against Ainsley Ball when checking the video camera in Officer Bisciglia's KPD squad car.

260.    After the video showing Officer Bisciglia's use of force was discovered, the KPD hired an outside expert to review Officer Bisiglia's use of force.

261.    The outside expert found that Officer Bisciglia's use of force against Ainsley Ball was unreasonable.

262.    Officer Bisciglia's KPD reports regarding the incident with Ainsley Ball were inaccurate, incomplete and untruthful.

263.    Officer Bisciglia used excessive force against Ainsley Ball.

*Judge Finds Widespread Misconduct by the KPD*

264. During a murder investigation in April 2014, KPD Officer Kyle Baars claimed that he found a backpack with a suspect's identification card and a .22 caliber bullet, when in fact Officer Baars planted the items in the backpack.

265. The planting of evidence by Officer Baars, and the subsequent actions of KPD personnel and Kenosha County District Attorney Robert Zapf, led to a Wisconsin Supreme Court Office of Lawyer Regulation Complaint against Mr. Zapf.

266. The Wisconsin Supreme Court Office of Lawyer Regulation appointed retired Racine County Circuit Court Judge Dennis J. Flynn to act as the Referee in the Complaint against Mr. Zapf.

267. On August 17, 2017, Judge Flynn issued a Report and Recommendations regarding the Complaint against Mr. Zapf.

268. A copy of the Report and Recommendations issued by Judge Flynn regarding the Complaint against Mr. Zapf is attached to this Federal Complaint as Exhibit C, and is incorporated as part of this Federal Complaint.

269. In the Report and Recommendations, Judge Flynn made numerous findings of fact regarding misconduct by KPD command staff, supervisors and officers, as will be set forth in the subsequent paragraphs.

270. On or about October 28, 2014, Officer Baars told KPD Detective Jason Kenesie about the planting of evidence. (Exhibit C at p.34).

271.   Instead of questioning Officer Baars as a suspect in the crime of planting evidence, Detective Kenesie ordered Officer Baars to prepare a supplemental report regarding the planting of evidence. (Exhibit C at p.34).

272.   Officer Baars prepared the supplemental report regarding the planting of evidence, dated October 29, 2012. (Exhibit C at p.34).

273.   Detective Kenesie rejected Officer Baars' October 29, 2012 report, allegedly for a lack of clarity, and ordered Officer Baars to prepare a second report. (Exhibit C at p.34).

274.   Officer Baars prepared the second report regarding the planting of evidence, dated October 31, 2012. (Exhibit C at p.34).

275.   Detective Kenesie rejected Officer Baars' October 31, 2012 report, again allegedly for a lack of clarity, and ordered Officer Baars to prepare a third report. (Exhibit C at pp.34-35).

276.   Officer Baars prepared the third report regarding the planting of evidence, dated November 11, 2014, but refused to sign the third report. (Exhibit C at p.35).

277.   Detective Kenesie, KPD Sergeant Gene Heckel, KPD Detective Matthew Hagen, KPD Captain Tom Hansche and KPD Deputy Chief of Police Daniel Miskinis were involved in the preparation of Officer Baars' three reports regarding the planting of evidence. (Exhibit C at pp.36, 43).

278.   Judge Flynn found that the purpose of the involvement of KPD supervisors in the the preparation of Officer Baars' three reports was to control the

facts and to attempt to control the damage to the KPD from the criminal activity of Officer Baars. (Exhibit C at pp.36-37, 43).

279.    Officer Baars offered to prepare a fourth report regarding the planting of evidence, but Detective Kenesie rejected the offer. (Exhibit C at p.35).

280.    Sergeant Heckel signed the November 11, 2014 third report, despite being aware that Officer Baars refused to sign and did not approve of the November 11, 2014 report. (Exhibit C at pp.37, 44).

281.    The names of Sergeant Heckel or of any other KPD senior officer do not appear on the November 11, 2014 report. (Exhibit C at p.37).

282.    Judge Flynn found that there was a strong inference of a cover-up by the KPD in the action of Sergeant Heckel signing the November 11, 2014 report when the report was neither signed nor approved by Officer Baars. (Exhibit C at p.37).

283.    KPD Chief of Police John Morrissey claimed to have been informed of Officer Baars' planting of evidence for the first time on January 9, 2015. (Exhibit C at p.38).

284.    Judge Flynn found that Chief Morrissey's claim of being informed of Officer Baars' planting of evidence for the first time on January 9, 2015 to be not credible. (Exhibit C at p.38).

285.    The KPD allowed Officer Baars to continue to serve as a KPD officer for approximately two and one-half months after Officer Baars admitted planting evidence. (Exhibit C at p.35).

44

286. On January 9, 2015, Chief Morrissey ordered Officer Baars to be placed on administrative leave. (Exhibit C at p.38).

287. Judge Flynn found that the delay from approximately October 28, 2014 (when Officer Baars admitted to planting evidence) to January 9, 2015 (when Chief Morrissey ordered Officer Baars to be placed on administrative leave) to create the inference of a cover-up. (Exhibit C at p.38).

288. On January 9, 2015, Chief Morrissey ordered a KPD internal investigation into Officer Baars' actions of planting of evidence. (Exhibit C at p.38).

289. Judge Flynn found that the delay from approximately October 28, 2014 (when Officer Baars admitted to planting evidence) to January 9, 2015 (when Chief Morrissey ordered a KPD internal investigation into Officer Baars' planting of evidence) to create the inference of a cover-up. (Exhibit C at p.38).

290. On January 9, 2015, Detective Kenesie, KPD Detective Matthew Hagen and KPD Captain Eric Larsen informed Mr. Zapf about Officer Baars' planting of evidence, which pertained to a criminal case that Mr. Zapf was prosecuting. (Exhibit C at p.38).

291. Mr. Zapf requested that Detective Kenesie, Detective Hagen and Captain Larsen prepare a written report about Officer Baars' planting of evidence. (Exhibit C at p.38).

292. Detective Kenesie, Detective Hagen and Captain Larsen never prepared a written report about Officer Baars' planting of evidence, as requested by Mr. Zapf. (Exhibit C at p.38).

293. On January 18, 2015, Officer Baars resigned from the KPD. (Exhibit C at p.39).

294. On January 19, 2015, Chief Morrissey met with Mr. Zapf, informing Mr. Zapf of Officer Baars' resignation and asking Mr. Zapf whether the conduct of Officer Baars in planting evidence was a crime. (Exhibit C at p.39).

295. On January 19, 2015, Mr. Zapf asked Chief Morrissey for a written report regarding what Chief Morrissey, Detective Kenesie, Detective Hagen and Captain Larsen had told Mr. Zapf about Officer Baars' planting of evidence. (Exhibit C at p.40).

296. Chief Morrissey, Detective Kenesie, Detective Hagen and Captain Larsen never prepared the written report, as requested by Mr. Zapf. (Exhibit C at p.40).

297. On January 21, 2015, Detective Kenesie submitted the November 11, 2014 report to Mr. Zapf. (Exhibit C at pp.44-45).

298. The KPD knew that Mr. Zapf had requested a written report regarding Officer Baars' planting of evidence and his resignation from the MPD, so Mr. Zapf could convey that information to lawyers for the criminal defendants and two Kenosha County judges in pending criminal cases. (Exhibit C at p.45).

299. Judge Flynn found that, by submitting the November 11, 2014 report to Mr. Zapf, the KPD knowingly submitted an incorrect and incomplete report. (Exhibit C at p.45).

300.   Judge Flynn found that, by submitting the November 11, 2014 report to Mr. Zapf, the KPD, its Chief of Police and its police officers "engaged in an intentional cover-up of evidence of police misconduct in a homicide case relating to the actions of Officer Baars." (Exhibit C at p.46).

301.   Judge Flynn found that, by submitting the November 11, 2014 report to Mr. Zapf, the KPD, its Chief of Police and its police officers intentionally planted a false report as evidence in a criminal case, because the KPD knew that Mr. Zapf would be providing the false report to the lawyers for the criminal defendants and the two presiding Kenosha County judges. (Exhibit C at pp.47-48).

302.   The KPD prepared two internal investigation reports regarding Officer Baars' planting of evidence. (Exhibit C at p.40).

303.   The two KPD internal investigation reports failed to provide dates for KPD officers' internal discussions of Officer Baars' planting of evidence and contained factual errors. (Exhibit C at pp.40-42).

304.   Judge Flynn found that, by keeping Officer Baars on the KPD instead of treating him as a criminal suspect after he admitted to planting evidence, the KPD retained control over Officer Baars and control over what Officer Baars said about the planting of evidence. (Exhibit C at p.46).

305.   Judge Flynn found that the KPD engaged in an extensive cover-up of Officer Baars' planting of evidence for over two months, by "suggestive manipulation of reports, lying, deceit and evidence falsification." (Exhibit C at pp.55-56).

## Prior Misconduct Allegations against Torres

306.  Prior to shooting and killing Aaron Siler on March 14, 2015, Torres had an extensive record of misconduct allegations as a KPD officer.

307.  Prior to March 14, 2015, there were 21 citizen complaints against Torres for misconduct.

308.  Prior to March 14, 2015, there were nine citizen complaints against Torres for excessive force.

309.  Prior to March 14, 2015, the KPD disciplined Torres for only one of the 21 citizen complaints against him, giving Torres a verbal reprimand for derogatory comments Torres made to a person in KPD custody.

310.  Upon information and belief, prior to March 14, 2015, the Kenosha Council of the League of United Latin American Citizens received six or seven excessive force complaints against Torres, and one complaint by a woman who claimed to be sexually assaulted by Torres.

### *Torres Used Excessive Force against Timothy Lupi*

311.  Upon information and belief, one of the citizen complaints against Torres for excessive force was made by Timothy Lupi.

312.  Upon information and belief, on July 5, 2005, Timothy Lupi called 911 to request KPD assistance with a domestic matter at his residence.

313.  Upon information and belief, Torres responded to Timothy Lupi's residence.

314. Upon information and belief, Torres entered Timothy Lupi's residence, and ordered Mr. Lupi to put down his 18-month-old daughter who he was holding.

315. Upon information and belief, Timothy Lupi told Torres that he was the person who called 911, and that putting down his daughter would cause her to cry.

316. Upon information and belief, Torres then fired his Taser stun gun at Timothy Lupi while he was still holding his 18-month-old daughter in his arms.

317. Upon information and belief, after Torres fired the Taser stun gun at Timothy Lupi, Mr. Lupi fell to the ground and had to roll while falling so that he did not crush his daughter.

318. Upon information and belief, after Timothy Lupi fell to the ground, KPD officers grabbed Mr. Lupi's daughter from his arms.

319. Upon information and belief, while Timothy Lupi was on the ground, Torres sat on Mr. Lupi's chest and punched Mr. Lupi in the face.

320. Upon information and belief, as Torres punched Timothy Lupi in the face, KPD officers restricted Mr. Lupi's arms so that he was unable to protect himself.

321. Upon information and belief, Timothy Lupi was wearing his glasses when Torres punched him in the face, causing the glasses to break and glass to be driven into Mr. Lupi's eyes.

322. Upon information and belief, the KPD officers then handcuffed Timothy Lupi.

323.   Upon information and belief, after Timothy Lupi was handcuffed, Torres fired his Taser stun gun at Mr. Lupi's chest after Mr. Lupi questioned Torres' use of force.

324.   Upon information and belief, at the times Torres fired the Taser stun gun at Timothy Lupi and punched Mr. Lupi in the face, there was no imminent threat to Torres or anyone else's safety, and Mr. Lupi was not actively resisting Torres.

325.   Upon information and belief, Torres used excessive force against Timothy Lupi by firing the Taser stun gun at Mr. Lupi and by punching Mr. Lupi in the face.

326.   Upon information and belief, Timothy Lupi attempted to file a citizen complaint with the KPD regarding Torres' use of excessive force.

327.   Upon information and belief, as Timothy Lupi attempted to file his citizen complaint with the KPD, he was subjected to demeaning and intimidating comments from KPD officers.

328.   Upon information and belief, the KPD failed to discipline Torres for using excessive force against Timothy Lupi.

*Torres Used Excessive Force against 19-Year-Old Man*

329.   Upon information and belief, in the summer of 2008, Torres arrested a 19-year-old man.

330.   Upon information and belief, Torres handcuffed the 19-year-old man and placed him into the back seat of a KPD squad car.

50

331. Upon information and belief, Torres then punched the 19-year-old man several times as he was handcuffed in the back seat of a KPD squad car.

332. Upon information and belief, at the time Torres punched the 19-year-old man, there was no imminent threat to Torres or anyone else's safety, and the 19-year-old man was not actively resisting Torres.

333. Torres used excessive force against the 19-year-old man by punching him.

334. Upon information and belief, the KPD failed to discipline Torres for using excessive force against the 19-year-old man.

*Torres Used Excessive Force against Kimberly Hollis*

335. Upon information and belief, one of the citizen complaints against Torres for excessive force was made by Kimberly Hollis.

336. Upon information and belief, in 2010, Torres slammed Kimberly Hollis' face into the ground.

337. Upon information and belief, Torres used excessive force when slammed Kimberly Hollis' face into the ground.

338. Upon information and belief, the KPD failed to discipline Torres for using excessive force against Kimberly Hollis.

*Torres Shot a Suicidal Man Only 10 Days Prior to Shooting Aaron Siler*

339. On March 4, 2015, a Kenosha woman called 911 to report to the KPD that her husband was going to kill himself.

340. The KPD dispatched two officers to respond to the Kenosha woman's report.

341. When they responded to the scene, the two KPD officers realized that the suicidal man was holding two knives.

342. After they observed the suicidal man holding two knives, one KPD officer drew his Taser stun gun and the other KPD officer drew his gun.

343. The two KPD officers told the suicidal man to drop the knives.

344. The suicidal man did not drop the knives, telling the two KPD officers that he wanted to die.

345. Torres then arrived on the scene.

346. Torres claimed to observe the suicidal man move towards the two KPD officers and swing the knives at one of the officers.

347. After Torres claimed to observe the suicidal man move towards the two KPD officers and swing the knives at one of the officers, Torres shot the suicidal man in the chest.

348. The two other KPD officers did not fire any weapon at the suicidal man, despite having already drawn their weapons and being closer to the suicidal man than Torres.

349. After Torres shot the suicidal man, the KPD placed Torres on an administrative leave.

350. On March 13, 2015, the KPD contacted Torres and requested that he return to work the next day, one day earlier than his scheduled leave.

351.   Pursuant to the KPD's request, Torres returned to work on March 14, 2015.

352.   Torres planned to "lay low" and keep his police activities to a minimum on March 14, 2015, due to the fact that he shot the suicidal man on March 4, 2015.

### The Shooting and Killing of Aaron Siler on March 14, 2015

353.   On March 14, 2015, the KPD received a call that Aaron Siler had an arrest warrant due to a probation and parole violation.

354.   The probation and parole violation that led to the arrest warrant for Aaron Siler was for missing counseling sessions and office visits with his probation agent.

355.   Aaron Siler did not have an arrest warrant due to the crimes of suffocation and strangulation, or for any other violent criminal activity.

356.   The caller told the KPD that Aaron Siler was driving a purple vehicle and was heading to a plasma center.

357.   Despite wanting to "lay low" and keep his police activities to a minimum, Torres volunteered to respond to the call regarding Aaron Siler.

358.   Torres located the purple vehicle that Aaron Siler was driving and attempted a traffic stop.

359.   Aaron Siler did not stop the purple vehicle in response to Torres' attempted traffic stop.

360.   Torres escalated the situation by initiating a vehicle pursuit of Aaron Siler.

361.    According to investigative reports, during the vehicle pursuit, KPD Officer Warren Arnold could hear emotion in Torres' voice as Torres communicated on a police radio.

362.    During the vehicle pursuit, Torres got on the KPD radio and told other officers to stay back if Aaron Siler attempted to run away because Torres was going to release his police canine for the purpose of chasing Mr. Siler.

363.    The KPD Policy and Procedure pertaining to the Police Canine Unit, Section III(G) permits police canines to be used for the following purposes:  (a) to search a building; (b) to track lost or missing persons or suspects; (c) to search articles; (d) to search areas; (e) to detect drugs or narcotics; (f) to sniff suspected drug money; (g) to search schools; and (h) for public relations demonstrations.

364.    The KPD Policy and Procedure pertaining to the Police Canine Unit, Section III(G) does not recognize releasing a police canine to chase a suspect as a proper purpose for the canine.

365.    When Aaron Siler exited the purple vehicle and began to flee, Torres escalated the situation by initiating a foot pursuit.

366.    According to investigative reports, when Torres reported the foot pursuit on his police radio, KPD Officer Anne Greenfield heard that Torres' voice sounded distressed and Officer Greenfield felt that something was wrong.

367.    Torres escalated the situation by attempting to release his police canine from the KPD squad car to chase after Aaron Siler.

Case 2:17-cv-01324-PP   Filed 09/28/17   Page 54 of 68   Document 1

368. By attempting to release his police canine to chase after Aaron Siler, Torres violated the KPD Policy and Procedure pertaining to the Police Canine Unit, Section III(G).

369. The KPD failed to discipline Torres for his violation of the KPD Policy and Procedure pertaining to the Police Canine Unit, Section III(G).

370. After jumping a fence, Torres realized that his police canine was not with him and that he had lost track of the canine.

371. By losing track of his police canine, Torres violated several provisions of the KPD Police Canine Unit Policy, Section III(F) pertaining to Canine Officer/Handler Responsibilities, including: (a) "[t]he Canine Officer/Handler is at all times responsible for the tactical use and control of their assigned canine"; (b) "Canine Officers/Handlers shall not carelessly or recklessly handle a department canine"; (c) "Whether on or off-duty, Canine Officers/Handlers shall be responsible for maintaining the security of his/her assigned canine and canine vehicle"; (d) Whether on or off-duty, Canine Officers/Handlers shall maintain control over their canines at all times"; (e) "The Canine Officer/Handler shall keep his/her canine on a lead or under complete control at all times"; and (f) "The Canine Officer/Handler shall ensure that unauthorized civilian or police personnel do not come into contact with their assigned canine."

372. The KPD failed to discipline Torres for his violation of the KPD Policy and Procedure pertaining to the Police Canine Unit, Section III(F).

373.   During Torres' foot pursuit of Aaron Siler, KPD Officer J.D. Van Wie could not understand Torres' police radio transmissions because Torres was yelling and his voice had a high pitch.

374.   During Torres' foot pursuit of Aaron Siler, Torres reported that he observed a Hispanic male standing at an open garage door pointing or gesturing at someone inside the garage.

375.   Torres escalated the situation by entering the garage, with his gun already drawn.

376.   The KPD Use of Force policy states that an officer shall not draw his gun unless circumstances create reasonable cause to believe that it may be necessary to use the gun.

377.   Prior to Torres drawing his gun, Aaron Siler had not displayed a weapon, had not engaged in any acts of violence against Torres or anyone else, and had not threatened violence against Torres or anyone else.

378.   Prior to Torres drawing his gun, there was no reasonable cause to believe that Aaron Siler presented an imminent threat of death or great bodily harm to Torres or anyone else.

379.   The KPD failed to discipline Torres for drawing his gun in violation of the KPD's Use of Force policy.

380.   After Torres entered the garage with his gun drawn, Torres observed Aaron Siler hiding by crouching down near the front of an SUV.

381. While standing at the driver's side of the SUV, Torres escalated the situation by yelling "get on the ground" numerous times at Aaron Siler.

382. After Torres yelled at Aaron Siler to get down on the ground, Mr. Siler stood up near the passenger side front tire of the SUV and yelled "shoot me" and "kill me" several times at Torres.

383. Aaron Siler then bent down at the passenger side front tire of the SUV.

384. As Aaron Siler stood back up, and while Torres was still standing at the driver's side of the SUV, Torres observed a black cylindrical pipe in what Torres assumed was Mr. Siler's right hand.

385. At the time Torres saw the black cylindrical pipe, he could not see Aaron Siler's hands.

386. At the time Torres saw the black cylindrical pipe. Aaron Siler was yelling "shoot me" at Torres.

387. Torres escalated the situation by chasing Aaron Siler around the SUV approximately two times.

388. During the time that Torres was chasing Aaron Siler around the SUV, Mr. Siler did not have anything in his hands.

389. Aaron Siler then bent down again near the front hood of the SUV.

390. After Aaron Siler bent down again, Torres did not see the black cylindrical pipe.

391. When Aaron Siler bent down again, he picked up an empty plastic bucket.

392.   An empty plastic bucket is not a deadly weapon.

393.   As Aaron Siler was still bent down near the front hood of the SUV, Torres fired seven gun shots at Mr. Siler, hitting Mr. Siler six times in the chest and shoulder.

394.   Aaron Siler did not move towards Torres prior to Torres shooting Mr. Siler.

395.   Torres was screaming at Aaron Siler when he shot Mr. Siler.

396.   Torres believed that he fired his gun three times.

397.   Torres in fact fired his gun seven times.

398.   Because Torres believed he fired three shots at Aaron Siler when he in fact fired seven shots, Torres cannot account for Mr. Siler's actions or location during four of Torres' gun shots.

399.   When Torres shot Aaron Siler, Torres was 10 to 12 feet away from Mr. Siler and on the opposite side of the SUV.

400.   When Torres shot Aaron Siler, Torres did not know what, if anything, Mr. Siler had in his hands.

401.   At the time Torres shot and killed Aaron Siler, there was no imminent threat of death or great bodily harm to Torres or anyone else presented by Mr. Siler.

402.   Torres used excessive force against Aaron Siler by shooting and killing Mr. Siler.

403. After shooting Aaron Siler, Torres saw Mr. Siler attempt to sit up by raising his shoulder off the ground, and he then lay back down on his back.

404. Aaron Siler was alive and still moving for a few minutes after he was shot by Torres.

405. Despite seeing that Aaron Siler was alive and moving after the shooting, Torres failed to provide any medical assistance to Mr. Siler.

406. After shooting Aaron Siler, Torres went to the entrance of the garage.

407. Torres then went into an alley next to the garage.

408. The KPD Policy and Procedure regarding Use of Force contains medical assistance requirements for KPD officers who use force.

409. The KPD Policy and Procedure regarding Use of Force, Section V Medical Assistance Requirement, requires that KPD officers who use deadly or non-deadly force "[c]heck the subject for injuries and administer first aid to your level of training if required" and to "[m]aintain close personal observation and keep in close physical contact with the subject while continuing to provide first aid while the subject is in [the officer's] custody."

410. After shooting Aaron Siler, Torres did not: (a) check Mr. Siler for injuries; (b) maintain close personal observation of Mr. Siler; (c) keep in close physical contact with Mr. Siler; or (d) administer any first aid to Mr. Siler.

411. The KPD failed to discipline Torres for his violations of the KPD Policy and Procedure regarding Use of Force, Section V Medical Assistance Requirement.

412. Torres' conduct during the incident with Aaron Siler, as set forth in the preceding paragraphs, was malicious and/or in reckless disregard of Mr. Siler's rights.

413. Within seconds after the shooting of Aaron Siler, eight or nine additional KPD officers arrived at the garage.

414. The additional KPD officers rolled Aaron Siler onto his chest and placed Mr. Siler in handcuffs.

415. The additional KPD officers failed to provide any medical assistance to Aaron Siler.

416. After he shot and killed Aaron Siler, Torres appeared to the additional KPD officers as shaken, panicked and to be in shock.

417. After the shooting and killing of Aaron Siler, KPD sergeant Timothy Ausse arrived on the scene.

418. Sergeant Ausse observed Torres walking along the west side of the garage, with his gun still drawn.

419. Sergeant Ausse had to tell Torres three times to holster his gun before Torres complied.

420. After the shooting and killing of Aaron Siler, KPD Detective Josh Hecker and KPD Officer Leslie Zielsdorf arrived on the scene.

421. Detective Hecker and Officer Zielsdorf took Torres from the scene of the shooting and killing of Aaron Siler to his KPD squad car to look for his police canine.

422.    After Torres located his police canine, Detective Hecker and Officer Zielsdorf took Torres to his residence.

423.    Detective Hecker and Officer Zielsdorf permitted Torres to go into his residence by himself.

424.    After permitting Torres to go into his residence by himself, Detective Hecker and Officer Zielsdorf were planning to take Torres to the hospital, because he was in shock, and then to the police union office.

425.    While on route to the hospital, KPD Sergeant Brent Sagedal contacted Detective Hecker and said that Torres should return to the scene of the shooting and killing of Aaron Siler to give a statement about the incident.

426.    Torres gave a brief statement to Sergeant Sagedal regarding his foot chase of Aaron Siler, but he did not address the shooting and killing of Mr. Siler.

427.    Torres told Sergeant Sagedal that he would not provide any further information.

428.    Sergeant Sagedal did not order Torres to make any statements about the shooting and killing of Aaron Siler.

429.    Consistent with Kenosha's failure to provide Torres with de-escalation training, upon information and belief and as set forth in the preceding paragraphs, Torres never attempted to de-escalate the situation with Aaron Siler with techniques such as: (a) actively or respectfully listening to Mr. Siler; (b) developing or maintaining a rapport with Mr. Siler; (c) using courteous and professional language with Mr. Siler; (d) managing his emotions and remaining calm; (e) using

body language that did not convey hostility; and (f) slowing down and waiting for back-up KPD officers to arrive.

430. Consistent with Kenosha's failure to provide Torres with de-escalation training, upon information and belief and as set forth in the preceding paragraphs, Torres escalated the situation with Aaron Siler several times by: (a) initiating a vehicle pursuit of Mr. Siler; (b) attempting to release his police canine to chase Mr. Siler; (c) initiating a foot pursuit of Mr. Siler; (d) becoming emotional and not remaining calm during his pursuit of Mr. Siler; (e) entering the garage with his gun drawn; (f) yelling and screaming at Mr. Siler inside the garage; and (g) shooting and killing Mr. Siler.

## CAUSES OF ACTION

### First Cause of Action
### Title 42, United States Code, Section 1983
### Excessive Force against Torres

431. The Plaintiffs re-allege, and incorporate by reference, the allegations of the preceding paragraphs.

432. Aaron Siler had a constitutionally protected right not to have excessive force used against him.

433. As set forth in the preceding paragraphs, Torres used excessive force against Aaron Siler.

434. Torres acted under color of law.

435. Torres' use of excessive force resulted in the death of Aaron Siler.

436.   Plaintiffs re-allege, and incorporate by reference, the allegations of the preceding paragraphs.

437.   The conduct of Torres, as set forth in the preceding paragraphs, which resulted in the death of Aaron Siler, deprived Gabriella Siler of the love, comfort, society and companionship of her father.

### Third Cause of Action
### Wisconsin Statute Section 895.46
### Indemnification against Kenosha

438.   Plaintiffs re-allege, and incorporate by reference, the allegations in the preceding paragraphs.

439.   At all times material hereto, Torres was carrying out his duties as a KPD officer, and was acting within the scope of his employment with Kenosha.

440.   The conduct of Torres, as set forth in the preceding paragraphs, resulted in the death of Aaron Siler.

441.   Kenosha is liable, pursuant to Wisconsin Statute Section 895.46, for any judgment entered against Torres in this action because, at all times material hereto, Torres was carrying out his duties as a KPD officer, and was acting within the scope of his employment with Kenosha.

## Fourth Cause of Action
## Title 42, United States Code, Section 1983
## Deficient Hiring and Continued Employment Policy against Kenosha

442.  Plaintiffs re-allege, and incorporate by reference, the allegations in the preceding paragraphs.

443.  As set forth in the preceding paragraphs, Aaron Siler suffered the constitutional rights violation of excessive force.

444.  At the time Aaron Siler suffered the constitutional rights violation of excessive force, Kenosha had a policy of deficient hiring and continued employment, as set forth in the preceding paragraphs.

445.  Kenosha's policy of deficient hiring and continued employment caused the constitutional rights violation of excessive force suffered by Aaron Siler.

## Fifth Cause of Action
## Title 42, United States Code, Section 1983
## Failure to Train Policy against Kenosha

446.  Plaintiffs re-allege, and incorporate by reference, the allegations in the preceding paragraphs.

447.  As set forth in the preceding paragraphs, Kenosha's training program was not adequate to train KPD officers to properly handle recurring situations.

448.  Kenosha's policymakers knew that it was highly predictable that constitutional rights violations of excessive force would occur without more and/or different training of KPD officers because, as set forth in the preceding paragraphs, there was a pattern of similar constitutional rights violations.

449. Kenosha's policymakers knew that it was highly predictable that constitutional rights violations of excessive force would occur without more and/or different training of KPD officers even without a pattern of similar constitutional rights violations.

450. Kenosha's failure to provide adequate training to KPD officers, as set forth in the preceding paragraphs, caused the constitutional rights violation of excessive force suffered by Aaron Siler.

**Sixth Cause of Action**
**Title 42, United States Code, Section 1983**
**Failure to Discipline Policy against Kenosha**

451. Plaintiffs re-allege, and incorporate by reference, the allegations in the preceding paragraphs.

452. As set forth in the preceding paragraphs, Kenosha failed to adequately discipline KPD officers.

453. Kenosha's policymakers knew that it was highly predictable that constitutional rights violations of excessive force would occur without adequate discipline of KPD officers because, as set forth in the preceding paragraphs, there was a pattern of similar constitutional rights violations.

454. Kenosha's policymakers knew that it was highly predictable that constitutional rights violations of excessive force would occur without adequate discipline of KPD officers even without a pattern of similar constitutional rights violations.

455. Kenosha's failure to adequately discipline KPD officers, as set forth in the preceding paragraphs, caused the constitutional rights violation of excessive force suffered by Aaron Siler.

**Seventh Cause of Action**
**Title 42, United States Code, Section 1983**
**Custom of Condoning Constitutional Rights Violations against Kenosha**

456. Plaintiffs re-allege, and incorporate by reference, the allegations in the preceding paragraphs.

457. As set forth in the preceding paragraphs, Aaron Siler suffered the constitutional rights violation of excessive force.

458. At the time Aaron Siler suffered the constitutional rights violation of excessive force, Kenosha had a custom of condoning constitutional rights violations, as set forth in the preceding paragraphs.

459. Kenosha's custom of condoning constitutional rights violations caused the constitutional rights violation of excessive force suffered by Aaron Siler.

**DEMAND FOR JUDGMENT**

460. Wherefore, the Plaintiffs demand judgment against the Defendants as follows:

    a. In favor of the Plaintiffs and against Torres and Kenosha, as set forth in the preceding paragraphs, jointly and severally, for compensatory and special damages;

    b. In favor of the Plaintiffs and against Torres, as set forth in the preceding paragraphs, for punitive damages;

c. In favor of the Plaintiffs and against Kenosha, as set forth in preceding paragraphs, for its liability pursuant to Wisconsin Statute Section 895.46;

d. For injunctive and other equitable relief reforming the policies and customs of Kenosha, to prevent like actions and harms in the future; and

e. For all costs, disbursements, interest and reasonable attorneys' fees pursuant to Title 42 of the United States Code, Section 1988, and for such other relief as the Court deems just and equitable.

**PLAINTIFFS HEREBY DEMAND A JURY TRIAL OF THIS ACTION ON ALL ISSUES SO TRIABLE.**

*/s/Jonathan S. Safran*
Jonathan S. Safran
Wisconsin State Bar No.:  1000881
Jerome A. Konkel
Wisconsin State Bar No.:  1000149
Jeffrey D. Patza
Wisconsin State Bar No.:  1030512
SAMSTER, KONKEL, & SAFRAN, S.C.
Attorneys for Plaintiffs
1110 North Old World Third Street
Suite 405
Milwaukee, WI 53203
Phone:  (414)224-0400
E-mail:  jsafran@skslawyers.com
Email:  jkonkel@skslawyers.com
Email:  jpatza@skslawyers.com

Phillip R. Godin
Wisconsin State Bar No.: 1018592
GODIN GERAGHTY PUNTILLO CAMILLI, S.C.
Attorneys for Plaintiffs
6301 Green Bay Road
Kenosha, WI 53142
Phone: (262) 465-4094
E-mail: phil@ggplawyers.com

Date: September 28, 2017.