GABRIELLA SILER, a minor,
by her mother and guardian, Ikesha King,
and ESTATE OF AARON SILER,
by Special Administrator, Lisa Cerna,

       Plaintiffs,

v.                                 Case No.: 17-CV-1324

CITY OF KENOSHA
and PAUL (PABLO) E. TORRES,

       Defendants.

## PLAINTIFFS' RESPONSE TO DEFENDANT, PAUL TORRES', PROPOSED FINDINGS OF FACT IN SUPPORT OF SUMMARY JUDGMENT MOTION

Pursuant to United States District Court for the Eastern District of Wisconsin Civil Local Rule ("Civil L.R.") 56(b)(2)(B)(i), Plaintiffs respectfully submit the following response to the proposed findings of fact filed by Defendant, Paul (Pablo) E. Torres, for his summary judgment motion:

### *JURISDICTION AND VENUE*

1.    Because this action raises an alleged constitutional violation for excessive force, jurisdiction of the Court is conferred by Title 28 of the United States Code, Section 1331. [Dkt. #1, ¶2; Dkt. #11, ¶2].

**Plaintiffs' Response:** Agree.

2. Because the acts comprising the alleged constitutional rights violations occurred in the Eastern District of Wisconsin, the Court is the proper venue for this action. [Dkt. #3, Dkt. #11].

**Plaintiffs' Response:** Agree.

*PARTIES*

3. Defendant Paul (Pablo) E. Torres is a police officer for the City of Kenosha Police Department. [Dkt. #1, ¶8, Dkt. #11, ¶8].

**Plaintiffs' Response:** Agree.

4. Plaintiff, Gabriella Siler, is a minor and the biological child of Aaron Siler, deceased. Plaintiff, Gabriella Siler, proceeds in this action through her mother and guardian, Ikesha King. [Dkt. #1, ¶4].

**Plaintiffs' Response:** Agree.

5. Plaintiff, Estate of Aaron Siler, proceeds in this action through its Special Administrator, Lisa Cerna. [Dkt. #1, ¶5].

**Plaintiffs' Response:** Agree.

*FACTS*

6. Pablo Torres has been a police officer for 23 years. [Declaration of Pablo E. Torres "Torres Decl.", ¶3].

**Plaintiffs' Response:** Agree.

7. Torres is currently a Detective K9 Officer with the Kenosha Police Department. He was 42 years old at the time of the incident at issue in this case. [Torres Decl., ¶2].

**Plaintiffs' Response:** Agree.

8.     At approximately 9:35 a.m. on March 14, 2015, Officer Pablo Torres was on vehicle patrol with his canine partner when dispatch requested assistance apprehending Aaron Siler who was reportedly headed to the plasma center. [Torres Decl., ¶4].

**Plaintiffs' Response:** Agree.

9.     The 911 dispatcher told Torres that Siler was wanted for strangulation and suffocation. [Torres Decl., ¶5].

**Plaintiffs' Response:** Agree that the 911 dispatcher told Torres that there was a warrant for Aaron Siler for strangulation and suffocation. Disagree that Aaron was wanted for strangulation and suffocation. The warrant for Aaron was in fact a probation and parole warrant. [Deposition of Jacob Jansky ("Jansky Dep.") 108:11-22; Jansky Dep. Ex. 77 at p.10 (CITY0000345), ¶2].

10.     Torres also understood from the information provided by dispatch that Siler took a vehicle without consent, was known to have violent tendencies and that Torres should use caution as a result. [Torres Decl., ¶6].

**Plaintiffs' Response:** Agree.

11.     Torres told dispatch that he was in the vicinity and could handle the call. [Torres Decl., ¶8].

**Plaintiffs' Response:** Agree that Torres responded to dispatch and volunteered to take the call involving Aaron Siler. Disagree that Torres "could handle the call," due to the facts set forth below.

Torres was not originally scheduled to work on March 14, 2015, the day he shot and killed Aaron Siler. [Deposition of Pablo E. Torres ("Torres Dep.") 30:19-20]. Just ten days earlier, Torres shot a suicidal man named Terry Knight. [Torres Dep. 36:18-37:1]. Torres described the day he shot Mr. Knight as "pretty chaotic for me." [Torres Dep. 36:18-21]. In returning to police work on March 14, 2015, Torres stated that he was going to "lay low," due to his shooting of Mr. Knight on March 4, 2015. [Torres Dep. 35:12-20; Jansky Dep. 56:7-57:2; Jansky Dep. Ex. 77 at p.3 (CITY0000338), ¶7]. When asked what he meant by intending to "lay low" on March 14, 2015, Torres explained that he "wasn't going to be very active that day." [Torres Dep. 35:21-36:6]. For example, Torres stated that he "wasn't going to go out and, you know, start doing a lot of traffic enforcement" and "wasn't going to take a warrant list and start looking for warrants." [Torres Dep. 36:7-15]. Torres "wanted to come back and ease into things." [Torres Dep. 37:19-25]. Torres "didn't want to create waves" and "just wanted to come back to work and have a non-eventful day." [Torres Dep. 40:5-20].

12.     Torres then accessed information about Siler on the computer in his vehicle which confirmed what dispatch had told him and provided additional information. [Torres Decl., ¶9].

**Plaintiffs' Response:**  Object because the phrases "information about Siler," "what dispatch had told him" and "additional information" are vague. Due to the vagueness of number 12, Plaintiffs are unable to agree or disagree.

13. Among other things, Torres learned that Siler was a large (6'4") and young (26 years old) man. [Torres Decl., ¶10].

**Plaintiffs' Response:** Object because the phrases "among other things" and "large" are vague. Subject to objection, agree that Aaron Siler was 6"4' and 26 years old.

14. Torres was 5'7" and 155 pounds and over 15 years older than Siler at the time. [Torres Decl., ¶11].

**Plaintiffs' Response:** Agree.

15. As Torres approached a stop light, Siler passed right in front of Torres from left to right at an intersection. [Torres Decl., ¶12].

**Plaintiffs' Response:** Agree.

16. When Torres spotted the car, he activated his emergency lights. [Torres Decl., ¶13].

**Plaintiffs' Response:** Agree.

17. Siler did not stop. [Torres Decl., ¶14].

**Plaintiffs' Response:** Agree.

18. Torres activated his sirens. [Torres Decl., ¶15].

**Plaintiffs' Response:** Agree.

19. Siler still did not stop. [Torres Decl., ¶16].

**Plaintiffs' Response:** Agree.

20. Siler made a number of fast turns into residential side streets, ignoring traffic signs, speed limits and generally heading back toward the location where Torres first spotted him. [Torres Decl., ¶17].

**Plaintiffs' Response:** Agree.

21. Based on his driving behavior Torres suspected that Siler was looking for a place to leave the car to try to escape on foot. [Torres Decl., ¶18].

**Plaintiffs' Response:** Object because the phrase "driving behavior" is vague. Also object because Torres lacks personal knowledge to speculate as to what Aaron Siler intended to do. Subject to objection, agree to Aaron's conduct during the vehicle pursuit, as set forth in Plaintiffs' response to number 22.

22. Siler ultimately sped up and traveled at high speeds, far in excess of the posted speed limits, drove on the wrong side of the street and failed to comply with stop signs and traffic controls. [Torres Decl., ¶19].

**Plaintiffs' Response:** Object because the phrases "sped up and traveled at high speeds" and "far in excess of the posted speed limits" are vague. Subject to objection, agree.

23. Torres even fell further behind Siler even though Torres reached speeds above 80 miles per hour. [Torres Decl., ¶20].

**Plaintiffs' Response:** Agree.

24. Siler's conduct during the vehicle pursuit showed a disregard for the lives of others, as well as for Siler's own life. [Torres Decl., ¶21].

**Plaintiffs' Response:** Object because number 24 is an irrelevant argument masquerading as a proposed finding of fact. Also object because Torres lacks personal knowledge to speculate as to the level of regard Aaron Siler had for the lives of others and/or his own life. Subject to objection, agree to Aaron's conduct during the vehicle pursuit, as set forth in Plaintiffs' response to number 22.

25.     The vehicle chase ended when Siler attempted to turn left at such speed that he left the road to the right, went up on the lawn narrowly missing a house before hitting a tree and sideswiping another car before swerving completely back across the street where he crashed near the opposite curb. [Torres Decl., ¶22].

**Plaintiffs' Response:** Agree.

26.     The vehicle pursuit lasted over three minutes before Siler crashed his vehicle. [Torres Decl., ¶23].

**Plaintiffs' Response:** Agree.

27.     Siler immediately abandoned his badly damaged vehicle and began to flee on foot. [Torres Decl., ¶24].

**Plaintiffs' Response:** Agree.

28.     Sighting Siler in person for the first time, Torres found him an imposing figure, a "huge" individual much taller and heavier than Torres. [Torres Decl., ¶25].

**Plaintiffs' Response:** Object because number 28 is vague, lacking in personal knowledge, speculation, and an argument masquerading as a proposed

finding of fact. Subject to objection, agree that Aaron Siler was 6"4 and weighed 243 pounds. [Declaration of Brian Peterson, dated November 15, 2018, ¶3].

29.    Torres followed Siler on foot. [Torres Decl., ¶26].

**Plaintiffs' Response:**  Agree.

30.    At the time, Torres was wearing his ballistic vest (body armor) with ceramic insert and his police duty belt with a handgun, a holster, two spare magazines, a magazine pouch, handcuffs, a handcuff pouch, a radio, and other items which weighed approximately 20 pounds. [Torres Decl., ¶27].

**Plaintiffs' Response:**  Object because the phrase "at the time" is vague. Subject to objection, agree that Torres had the police equipment identified in number 30 at all times during the incident with Aaron Siler on March 14, 2015.

31.    In pursuit of Siler, Torres noticed that Siler was grabbing at his waistband while he ran and generally kept his hands in front of him where Torres could not see them. [Torres Decl., ¶28].

**Plaintiffs' Response:**  Disagree. Since fatally shooting Aaron Siler on March 14, 2015, Torres has offered inconsistent statements as to whether or not he saw Aaron's hands during the foot pursuit.

The State of Wisconsin Department of Justice, Division of Criminal Investigation ("DCI") interviewed Torres on March 17, 2015, three days after the fatal shooting of Aaron Siler. [Jansky Dep. 36:22-38:3; Jansky Dep. Ex. 77 at p.3 (CITY0000338), ¶¶1-2]. During his DCI interview, Torres said that he never saw Aaron's hands during the foot pursuit, which caused him to be concerned that

Aaron may have a weapon. [Jansky Dep. 73:10-74:6; Jansky Dep. Ex. 77 at p.5 (CITY0000340), ¶6]. Torres said nothing in his DCI interview about Aaron allegedly grabbing his waistband. [Jansky Dep. 75:3-24; Jansky Dep. Ex. 77 at p.5 (CITY0000340), ¶6].

Attorney Emanuel Kapelsohn was a consultant for the Kenosha County District Attorney ("DA"), hired in September 2015 to evaluate Torres' use of deadly force against Aaron Siler and to prepare a report. [Kapelsohn DA Report, p.1 (CITY00002115), ¶¶1-2] Attorney Kapelsohn interviewed Torres in January of 2016. [Id. p.2 (CITY0002116), ¶4]. The interview was not recorded. [Deposition of Emanuel Kapelsohn ("Kapelsohn Dep.") 89:13-23]. Torres told Attorney Kapelsohn that he never saw Aaron's hands during the foot pursuit which caused Torres concern that Aaron might have a weapon. [Kapelsohn DA Report, p.4 (CITY0002118), ¶5; Kapelsohn Dep. 97:13-98:1]. And Torres never told Attorney Kapelsohn that he saw Aaron grab at his waistband. [Kapelsohn DA Report, p.4 (CITY0002118), ¶5; Kapelsohn Dep. 105:10-19, 106:11-19].

It was not until Plaintiffs' counsel deposed Torres in September 2018 when Torres admitted that he saw Aaron Siler's hands multiple times during the foot pursuit, and that he never saw a weapon in Aaron's hands. [Torres Dep. 73:8-21, 85:4-25]. It was also at his September 2018 deposition, which was more than three and one-half years after the fatal shooting of Aaron, when Torres first claimed to have allegedly seen Aaron grabbing his waistband during the foot pursuit. [Torres Dep. 73:12-16].

32.     During the course of the foot pursuit, Siler scaled two fences with ease. [Torres Decl., ¶29].

**Plaintiffs' Response:**   Object because the phrase "with ease" is vague and because Torres lacks personal knowledge to speculate as to how hard it was for Aaron Siler to climb over the fences. Subject to objection, disagree that Torres saw Aaron climb over two fences with ease. Prior to fatally shooting Aaron on March 14, 2015, Torres did not know Aaron. [Torres Dep. 9:8-11]. If Torres did not know Aaron, he also did not know Aaron's health status and/or physical condition. Torres therefore does not know how difficult it was for Aaron to climb over two fences while Torres was chasing him. Also subject to objection, agree that Aaron climbed over two fences.

33.     The fences were approximately four and six feet tall, respectively. [Torres Decl., ¶30].

**Plaintiffs' Response:**   Agree.

34.     Throughout the chase, Torres was calling out commands to Siler of "stop," "police" and "get on the ground." [Torres Decl., ¶31].

**Plaintiffs' Response:**   Agree, except for noting that Torres was yelling the commands at Siler. [Torres Dep. 97:3-10].

35.     Siler did not obey any of the commands. [Torres Decl., ¶32].

**Plaintiffs' Response:**   Agree.

36.     At that point during the foot pursuit, Torres had information that Siler had committed a violent felony – strangulation and suffocation – and another

felony by fleeing an officer in a vehicle, along with multiple other law violations for fleeing an officer on foot, hit and run for leaving the scene of an accident, and numerous traffic violations. [Torres Decl., ¶33].

**Plaintiffs' Response:** Agree.

37. Torres perceived Siler to be desperate given Siler's willingness to engage in a high-speed chase, break numerous laws, his refusal to stop the car chase until he crashed, his willingness and ability to easily scale fences, and his relentless effort to escape despite being given frequent opportunities to comply with Torres's commands and surrender. [Torres Decl., ¶34].

**Plaintiffs' Response:** Object because the words "easily" and "relentless" are vague, lacking in personal knowledge and argumentative. Subject to objection, disagree that Torres had any reason to perceive Aaron Siler to be desperate, because Torres had no idea what was in Aaron's mind during the chase. [Torres Dep. 112:12-15].

38. Given the information that Torres had gathered, Torres feared for his safety and the safety of others; therefore, Torres believed it was important to follow Siler in an effort to arrest him. [Torres Decl., ¶35].

**Plaintiffs' Response:** Object because the phrase "the information that Torres had gathered" is vague and because number 38 is an argument masquerading as a proposed finding of fact. Subject to objection, disagree that Torres had any reason to fear for his own safety and/or the safety of others while he was chasing Aaron Siler. Aaron had engaged in no act of violence against

Torres or anyone else, and Aaron had threatened no act of violence against Torres or anyone else. [Torres Dep. 114:19-115:5].

39.    During the foot chase, Torres lost sight of Siler as Siler outran Torres. [Torres Decl., ¶36].

**Plaintiffs' Response:**  Agree.

40.    Torres was able to catch sight of Siler again and followed Siler toward an unknown building. [Torres Decl., ¶37].

**Plaintiffs' Response:**  Agree.

41.    The diagram bates-numbered CITY0000347 is a diagram showing where Siler's vehicle swerved before crashing, and the dots indicate the approximate route of the foot pursuit. Torres found this document provides a fair and accurate depiction of the area of the vehicle crash and the approximate route of the foot pursuit. [Torres Decl., ¶38, Ex. A].

**Plaintiffs' Response:**  Agree.

42.    As Torres approached the building where he last spotted Siler, Torres was headed south and turned right at the southeast corner of the building which Torres discovered contained an auto body repair shop. [Torres Decl., ¶39].

**Plaintiffs' Response:**  Agree.

43.    As Torres turned at the corner of the building, Torres approached multiple rows of parked vehicles and he was concerned Siler may attempt to ambush him. [Torres Decl., ¶40].

**Plaintiffs' Response:** Object because Torres lacks personal knowledge to be concerned that Aaron Siler may have ambushed him. Subject to objection, agree that Torres turned the corner of the building and approached multiple rows of parked vehicles. Also subject to objection, disagree that Torres had any reason to be concerned that Aaron may attempt to ambush him. Aaron had engaged in no act of violence against Torres or anyone else, and Aaron had threatened no act of violence against Torres or anyone else. [Torres Dep. 114:19-115:5].

44. Torres then spotted an unknown man, later identified as Juan Carlos Salinas ("Salinas"), near the garage entrance on the south side of the building. [Torres Decl., ¶41].

**Plaintiffs' Response:** Agree.

45. Salinas gestured as if to communicate that who Torres was looking for was inside the garage. [Torres Decl., ¶42].

**Plaintiffs' Response:** Agree.

46. Upon entering the garage, Torres' eyes needed to adjust from the bright sunshine to the dim interior. [Torres Decl., ¶43].

**Plaintiffs' Response:** Agree.

47. Torres then saw another unknown man, later identified as Antonio Salinas Jaimes, ("Jaimes"), Salinas' brother. [Torres Decl., ¶44].

**Plaintiffs' Response:** Agree.

48. Torres noticed that Jaimes was a holding a baseball bat in a batter's stance, as if he was ready to swing to defend himself. [Torres Decl., ¶45].

**Plaintiffs' Response:** Object because Torres lacks personal knowledge to claim that Jaimes "was ready to swing the baseball bat as if to defend himself." Subject to objection, agree that Jaimes was holding a bat. Also subject to objection, disagree that Torres had any reason to believe that Jaimes was ready to swing the bat in self-defense. Torres did not speak to Jaimes inside the garage, so Torres had no idea why Jaimes was holding the bat. [Torres. Dep. 122:14-21].

49. This led Torres to believe that Jaimes was in fear of Siler. [Torres Decl., ¶46].

**Plaintiffs' Response:** Object because Torres lacks personal knowledge to believe that Jaimes was in fear of Aaron Siler. Subject to objection, disagree that Torres had any reason to believe that Jaimes was in fear of Aaron. Torres did not speak to Jaimes inside the garage, so Torres had no idea as to whether or not Jaimes was in fear. [Torres. Dep. 122:14-21].

50. None of the witnesses knew Siler prior to his entering the garage. [Torres Decl., ¶7; Deposition of Juan Carlos Salinas ("Salinas Dep.") 12:14-19; Deposition of Antonio Salinas Jaimes ("Jaimes Dep.) 13:5-8].

**Plaintiffs' Response:** Agree.

51. Additionally, Torres did not know the other witnesses prior to entering the garage, and they did not know him. [Torres Decl., ¶47; Salinas Dep. 12:20-25; Jaimes Dep., 13:9-14].

**Plaintiffs' Response:** Agree.

52.     Jaimes was in fact fearful of Siler, who, once in the garage, had lunged at Jaimes and tried to grab him. [Jaimes Dep., 71:10-24, 77:20-78:3; Salinas Dep., 52:9-56:1].

**Plaintiffs' Response:**   Object because number 52 is irrelevant. Subject to objection, disagree. When asked during his deposition to describe what Aaron Siler physically did, Jaimes described it as Aaron attempting to hug Jaimes with his hands to protect himself from the police. [Jaimes Dep. 28:9-17]. While Jaimes admitted that he did not know what Aaron was thinking, Jaimes specifically denied that Aaron wanted to grab him. [Id. 28:7-8, 23-24, 71:10]. Jaimes also said that Aaron was not threatening, and that Aaron never actually touched Jaimes. [Id. 29:1-5]. And when Jaimes did have the bat out, Aaron moved back to another room inside the garage to hide. [Id. 29:6-7].

53.     Jaimes believed that Siler put him and his brother in danger from the moment Siler entered the garage. [Jaimes Dep., 75:13-19; 76:5-21].

**Plaintiffs' Response:**   Object because number 53 is irrelevant speculation. Subject to objection, disagree that Aaron Siler ever put Jaimes and Salinas in danger, due to the facts set forth in Plaintiffs' response to number 52.

54.     Salinas also believed that Siler put him and his brother in danger during the whole incident. [Salinas Dep., 130:13-131:7; 135:9-14].

**Plaintiffs' Response:**   Object because number 54 is irrelevant speculation. Subject to objection, disagree that Aaron Siler ever put Jaimes and Salinas in danger, due to the facts set forth in Plaintiffs' response to number 52.

55. Salinas believed that if Siler could get to Torres, Torres would not be able to defend himself based on the size of Siler in comparison to Torres and because of how Siler was acting. [Salinas Dep. 134:17-135:5].

**Plaintiffs' Response:** Object because number 55 is irrelevant speculation. Also object because Salinas lacks the personal knowledge to speculate to what is set forth in number 55. Subject to objection, disagree that Salinas had any reason to speculate to what is set forth in number 55. Salinas testified that he had no idea of what Aaron was going to do inside the garage. [Salinas Dep. 55:17-22].

56. Siler was 6'4" and 243 pounds. [Declaration of Brian Peterson ("Peterson Decl."), ¶3].

**Plaintiffs' Response:** Agree.

57. Once in the garage, Torres saw a figure crouched over toward the front of an SUV parked on the right side of the garage. [Torres Decl., ¶48].

**Plaintiffs' Response:** Disagree. When Torres entered the garage, Aaron Siler was nowhere near the SUV parked on the right side of the garage. Instead, Aaron was in a back room of the garage where he had gone to hide. [Jaimes Dep. 32:10-13; Salinas Dep. 62:9-15; 65:24-66:5]. In fact, Torres did not know where Aaron was when he entered the garage, yelling "where is he at?!" [Salinas Dep. 62:9-15; 64:15-20; Jaimes Dep. 30:4-7]. After Jaimes told Torres that Aaron was in the back room hiding, Torres yelled several times at Aaron to get out of that room. [Jaimes Dep. 32:14-20; Salinas Dep. 66:6-22]. In response, Aaron came out of the back room, attempted to leave the garage but was stopped by Torres, and then

went to the passenger side of the SUV, not the front of the SUV. [Jaimes Dep. 32:21-33:4, 38:7-13; Salinas Dep. 67:4-19].

58.     Torres was tired when he arrived in the garage. [Torres Decl., ¶87; Jaimes Dep., 30:23-31:6].

**Plaintiffs' Response:**  Agree that Torres now claims to have been tired when he arrived at the garage. Torres never told the DCI he was tired during his interview three days after fatally shooting Aaron. [Jansky Dep. Ex. 77]. Likewise, when interviewed on January 15, 2016 by Attorney Emanuel Kapelsohn, who was consulting for the Kenosha County District Attorney, Torres said nothing about being tired. [Kapelsohn Report to DA, pp.4-7 (CITY002118-2121)].

59.     The intense sequence of events that happened next lasted less than 30 seconds. [Torres Decl., ¶49].

**Plaintiffs' Response:**  Object because the phrase "intense sequence of events that happened next" is vague. Due to the vagueness of number 59, Plaintiffs are unable to agree or disagree.

60.     Torres moved to the back of the SUV and ordered the person in front of the SUV to get on the ground. [Torres Decl., ¶50].

**Plaintiffs' Response:**  Agree that Torres ordered Aaron Siler to get on the ground, except for noting that Torres was yelling at Aaron. [Jaimes Dep. 32:10-33:7]. Disagree that Aaron was in front of the SUV. As stated in Plaintiffs' response to number 57, Aaron was in a back room of the garage hiding when Torres entered, came out of the room and tried to leave the garage but was

stopped by Torres, and then went to the passenger side of the SUV, not the front of the SUV.

61.     Siler began to play a game of cat and mouse with Torres from opposite sides of the SUV as Torres ordered Siler to get on the ground. [Torres Decl., ¶51; Salinas Dep. 68:1-69:2; Jaimes Dep., 33:1-14].

**Plaintiffs' Response:** Agree, except for noting that Torres was on the driver side of the SUV while Aaron Siler was on the passenger side of the SUV, and that Torres was yelling at Aaron. [Jaimes Dep. 33:1-14; Salinas Dep. 68:14-69:2].

62.     By this time, Torres had his gun drawn. [Torres Decl., ¶52].

**Plaintiffs' Response:** Agree.

63.     Siler did not obey any of Torres' commands. [Torres Decl., ¶53].

**Plaintiffs' Response:** Disagree. Aaron Siler obeyed Torres' command to come out of the back room where he had been hiding. [Jaimes Dep. 32:14-22; Salinas Dep. 66:6-16].

64.     If Torres moved forward to the front of the SUV, Siler moved to the back; if Torres moved to the back of the SUV, Siler moved to the front, always very fast. [Torres Decl., ¶54].

**Plaintiffs' Response:** Agree, except for noting that Aaron Siler moved to the front passenger side of the SUV, not the front of the SUV, and Torres moved to the front driver side of the SUV, not the front of the SUV, as set forth in Plaintiffs' response to number 61.

65. During this time, there was nothing between Siler and an open garage door to his left that would have prevented him from running out the garage door. [Torres Decl., ¶55].

**Plaintiffs' Response:** Disagree. Torres prevented Aaron Siler from running out the garage door. [Jaimes Dep. 38:7-13; Salinas Dep. 67:4-19].

66. The photo bates-numbered CITY0001165 shows a view of the open garage door from the side of the SUV that Siler was on at the time of the shooting. The photo shows a fair and accurate depiction of Siler's approximate proximity to the garage door and the change in lighting as Torres entered the garage on the day of the shooting. [Torres Decl., ¶56, Ex. B].

**Plaintiffs' Response:** Agree, except for noting that Torres originally claimed that Aaron Siler was in the front of the SUV at the time of the shooting, not at the passenger side of the SUV, as set forth in Plaintiffs' response to number 92.

67. Nonetheless, Siler did not attempt to flee. [Torres Decl., ¶57].

**Plaintiffs' Response:** Disagree. Aaron Siler did attempt to leave the garage, but was prevented from doing so by Torres. [Jaimes Dep. 38:7-13; Salinas Dep. 67:4-19].

68. At one point, Siler ended up in front of the passenger side fender and Torres was in front of the driver side fender. [Torres Decl., ¶58].

**Plaintiffs' Response:** Object because the phrases "at one point," "in front of the passenger side fender" and "in front of the driver side fender" are vague. Subject to objection, to the extent that number 68 refers to the location of Aaron

Siler and Torres at the time of the fatal shooting, Plaintiffs refer to the facts set forth in their responses to numbers 92 and 99.

69. The diagram bates-numbered CITY0000346 is a diagram showing an approximate overview of the garage along with the approximate location of Siler and Torres with the SUV between them at the time of the shooting. Torres reviewed this document with DCI agents during their investigation and found it to be a fair and accurate depiction of the approximate location of what it depicts. [Torres Decl., ¶59, Ex. C].

**Plaintiffs' Response:** Disagree because the diagram attached as Exhibit C to the Torres Declaration is an inaccurate document.

When the DCI interviewed Torres three days after the fatal shooting of Aaron Siler, Specials Agent Jacob Jansky and Jay Novak used a diagram of the shooting scene, Bates-numbered in this case as CITY0000346. [Jansky Dep. 109:2-23; Jansky Dep. Ex. 77 at p.11 (CITY0000346)]. Agent Jansky testified that the diagram, Bates-numbered CITY0000346 and marked as part of Exhibit 77 at his deposition, was an exact copy of the actual diagram used during the Torres interview. [Jansky Dep. 109:17-23]. Agent Jansky further testified that the original diagram had been placed into evidence and has not been disturbed. [Id. 110:3-113:19].

During the DCI interview, Torres made markings on the diagram and signed it. [Jansky Dep. 113:20-114:21; Jansky Dep. Ex. 77 at p.11 (CITY0000346)]. The "X" in front of the SUV on the passenger side, in front of the headlight,

represents where Torres said that Aaron Siler was at the time of the shooting. [Jansky Dep. 117:19-118:6; Jansky Dep. Ex. 77 at p.11 (CITY0000346)]. At his deposition in this case, Torres asserted that he did not know what the "X" in front of the vehicle represented in the diagram used during his DCI interview. [Torres Dep. 172:18-174:1]

The document attached as Exhibit C to the Torres Declaration purports to be the same diagram of the shooting scene used during the DCI interview of Torres, and contains the same Bates number of CITY0000346. [Torres Decl., ¶59, Ex. C]. But it is not the same diagram. The "X" in front of the SUV on the passenger side, in front of the headlight, where Torres originally claimed that Aaron Siler was at the time of the shooting, is absent from the diagram attached to the Torres Declaration. [Compare Jansky Dep. Ex. 77 at p.11 [CITY0000346] with Torres Decl., ¶59, Ex. C]. Exhibit C to the Torres Declaration therefore is an inaccurate document.

70. At that time, Salinas and Jaimes were in the same room of the garage where the SUV, Siler and Torres were located – Jaimes somewhere to Torres' left and Salinas somewhere behind Torres. [Torres Decl., ¶60; Salinas Dep., 69:8-72:6; Ex. 26; Jaimes Dep., 50:12-15, Ex. 33].

**Plaintiffs' Response:** Agree.

71. Torres and Salinas could see the anger in Aaron Siler's face. [Torres Decl., ¶61; Salinas Dep., 87:17-88.:3, 137:1-12].

**Plaintiffs' Response:** Object because Torres and Salinas lack the personal knowledge to "see anger in Aaron Siler's face." Subject to objection, disagree that Torres and Salinas "could see the anger in Aaron Siler's face." Prior to March 14, 2015, neither Torres nor Salinas knew Aaron, so they should not claim an ability to read Aaron's facial expressions. [Torres Dep. 9:8-11; Salinas Dep. 12:14-16]. Torres and Salinas also did not know what was in Aaron's mind, including whether or not Aaron was angry, scared or had any other possible emotion. [Torres Dep. 112:12-15; Salinas Dep. 128:15-25].

72. While Torres had his gun pointed at Siler, Torres again ordered Siler to the ground and Siler refused to comply, yelling "fuck you," "no" and "shoot me." [Torres Decl., ¶62].

**Plaintiffs' Response:** Agree, except for noting that Torres was also yelling at Aaron Siler. [Torres Dep. 128:16-129:3; Jaimes Dep. 33:1-7].

73. Torres noticed that Siler began looking to the ground and then up at Torres, still saying "fuck you," "no" and "shoot me." [Torres Decl., ¶63].

**Plaintiffs' Response:** Agree.

74. Torres could not see Siler's hands while Siler was on the opposite side of the SUV. [Torres Decl., ¶64].

**Plaintiffs' Response:** Agree.

75. Siler then bent over and when he stood up, Torres could see a black cylindrical steel pipe pressed against Siler's forearm, but still could not see Siler's hands. [Torres Decl., ¶65].

**Plaintiffs' Response:** Agree that at some point during the cat-and-mouse by the SUV, Torres could see a black cylindrical object pressed against Aaron's forearm but could not see Aaron's hands. Disagree that Torres had reason to believe he could see a steel pipe. The object was in fact the attached handle of a car floor jack. [Jaimes Dep. 34:1-7].

76.     Torres believed that Siler had armed himself with the pipe and was taking a pre-attack posture. [Torres Decl., ¶66].

**Plaintiffs' Response:** Object because Torres lacks the personal knowledge to speculate that Aaron Siler had "armed himself" and "was taking a pre-attack posture." Subject to objection, disagree that Torres had any reason to believe that Aaron Siler had armed himself with a pipe. Torres could not see Aaron's hands. [Torres Decl., ¶65]. And the black cylindrical object was an attached car floor jack handle, not a pipe. [Jaimes Dep. 34:1-7]. Also subject to objection, disagree that Torres had any reason to believe that Aaron was taking a pre-attack posture. Aaron never attacked, as set forth in the facts contained in Plaintiffs' responses to numbers 92-96.

77.     Torres ordered Siler to "drop it" and "get to the ground." [Torres Decl., ¶67; Salinas Dep., 74:22-75:1].

**Plaintiffs' Response:** Agree, except for noting that Torres was yelling at Aaron Siler. [Salinas Dep. 74:22-75:1].

78.     Siler shouted "fuck you," "no" and "shoot me," [Torres Decl., ¶68].

**Plaintiffs' Response:** Agree.

79. Salinas agrees that Siler yelled at Torres something to the effect of "kill me." [Salinas Dep., 88:25-89:4].

**Plaintiffs' Response:** Agree.

80. From his vantage point behind Torres, Salinas could see Siler bend over, lift and drop something multiple times that made a metal noise. [Salinas Dep., 76:10-77:9; 138:11-18].

**Plaintiffs' Response:** Object because Salinas lacks personal knowledge to claim that he could see Aaron Siler lift and drop something. Subject to objection, disagree that Salinas had any reason to assume that Aaron lifted and/or dropped anything because Salinas could not see Aaron's hands. [Salinas Dep. 86:1-2]. Salinas originally told DCI investigators that Aaron may have grabbed a piece of metal, but later clarified that he does not know what Aaron allegedly grabbed because he was not on the same side of the SUV as Aaron. [Id. 75:16-76:4]. Salinas also admitted that he "couldn't see to the other side" of the SUV where Aaron was located. [Id. 73:14-16].

81. To the left of Torres, Jaimes in fact saw Siler try to pick up the pipe that was being used as a handle and was attached to a floor jack. [Jaimes Dep., 33:16-34:25].

**Plaintiffs' Response:** Object because Jaimes lacks the personal knowledge to claim that Aaron Siler was trying to pick up the attached car floor jack handle. Subject to objection, agree that Jaimes saw Aaron grab the attached car floor jack handle. Also subject to objection, disagree that Jaimes saw Aaron try to pick up

the car floor jack handle. Jaimes had no idea as to what Aaron's intentions were, including why Aaron grabbed the car floor jack handle. [Jaimes Dep. 68:10-20]. Also subject to objection, disagree that Jaimes saw Aaron grab a "pipe that was being used as a handle." The object was the attached handle of a car floor jack, not a pipe. [Id. 34:1-7].

82.     Jaimes saw Siler lift the floor jack by the pipe to dislodge the steel pipe from the jack multiple times. [Jaimes Dep., 33:16-34:25].

**Plaintiffs' Response:**  Object because Jaimes lacks the personal knowledge to claim that Aaron Siler attempted to dislodge the attached handle from the car floor jack. Subject to objection, agree that Jaimes thought Aaron wanted to lift the entire floor jack by the handle, but the floor jack was heavy. [Jaimes Dep. 34:8-10]. Also subject to objection, disagree that Jaimes saw a "steel pipe." The object was not a steel pipe but instead was an attached car floor jack handle. [Id. 34:1-7]. Also subject to objection, disagree that Jaimes saw Aaron "lift the floor jack by the pipe to dislodge the steel pipe." Jaimes never testified that he saw Aaron try to dislodge the handle from the rest of the floor jack. Instead, Jaimes testified that he also did not know what Aaron's intentions were, including why Aaron grabbed the car floor jack handle. [Id. 68:10-20].

83.     Prior to the shooting, Torres did not see that the pipe was attached to a floor jack. [Torres Decl., ¶69].

**Plaintiffs' Response:**  Object because the phrase "prior to the shooting" is vague. Subject to objection, disagree that Torres had reason to believe that he saw

a pipe. The object was not a pipe but instead was an attached car floor jack handle. [Jaimes Dep. 34:1-7].

84.     The photo bates-numbered CITY0000887 shows a view from the front of the SUV with the black cylindrical pipe in the foreground attached to a floor jack. The photo shows a fair and accurate depiction of the black cylindrical steel pipe Torres saw pressed against Siler's forearm just prior to the shooting. [Torres Decl., ¶70, Ex. D].

**Plaintiffs' Response:**  Object because the phrase "just prior to the shooting" is vague. Subject to objection, disagree that the photo Bates-numbered as CITY0000887 shows any pipe. The object attached to the car floor jack is the floor jack handle, not a pipe. [Jaimes Dep. 34:1-7].

Also subject to objection, disagree that Torres saw the car floor jack handle near Aaron Siler's forearm "just prior to the shooting," because Jaimes witnessed other events in between Aaron's grabbing of the attached car floor jack handle and the shooting. After Aaron grabbed and let go of the attached car floor jack handle, Jaimes saw Aaron go away from the SUV to the entrance of another room in the garage to pick up a plastic bucket. [Jaimes. Dep. 49:11-19]. Torres denies seeing Aaron leave the SUV to pick up the plastic bucket, and denies ever seeing the bucket prior to shooting Aaron. [Torres Dep. 199:18-200:21]. Jaimes then witnessed Aaron return to the SUV, where he and Torres may have continued engaging the cat-and-mouse on opposite sides of the SUV. [Jaimes. Dep. 51:15-24, 73:24-74:1]. Jaimes claims that Aaron was holding the bucket sideways, and then

over his shoulder as if he was going to throw the bucket, even though Jaimes never saw the bucket come out of Aaron's hands and go forward. [Id. 54:12-56:25]. It was then that Torres began firing his gun. [Id. 57:1-5].

85.     Siler then began scanning the ground again, looking at the ground and then back up at Torres. [Torres Decl., ¶71].

**Plaintiffs' Response:** Disagree. Plaintiffs refer to the facts set forth in their response to number 84 for what Aaron Siler did to grab the plastic bucket, and what happened after Aaron grabbed the bucket.

86.     Siler was standing near the front passenger side tire at this time. [Torres Decl., ¶72; Jaimes Dep., 52:3-21; Salinas Dep., 72:14-73:19].

**Plaintiffs' Response:** Object because the phrases "near the front passenger side tire" and "at this time" are vague. Subject to objection, to the extent that number 86 refers to the location of Aaron Siler and Torres at the time of the fatal shooting, Plaintiffs refer to the facts set forth in their responses to numbers 92 and 99.

87.     Torres then saw Siler look around on the ground, fixate on something and then bend down again and make a grabbing motion. [Torres Decl., ¶73].

**Plaintiffs' Response:** Object because the phrases "make a grabbing motion" and "fixate on something" are vague. Subject to objection, disagree that Torres saw Aaron Siler make any "grabbing motion," because Torres could not see Aaron's hands. [Torres Decl., ¶74; Torres Dep. 148:14-149:6, 152:22-153:9, 155:13-19, 164:8-11]. And to the extent number 87 refers to Aaron picking up the plastic

bucket, disagree that Aaron picked up the plastic bucket while he was near the passenger side of the SUV. Aaron had to leave the SUV and go to the entrance of another room inside the garage to pick up the plastic bucket. [Jaimes Dep. 49:11-19].

88.     Torres still could not see Siler's hands. [Torres Decl., ¶74].

**Plaintiffs' Response:**  Agree.

89.     Torres thought that Siler might be reaching for an additional or better weapon. [Torres Decl., ¶75].

**Plaintiffs' Response:**   Object because Torres lacks personal knowledge to assume that Aaron Siler "might be reaching for an additional or better weapon." Subject to objection, disagree that Torres had any reason to believe that Aaron might be reaching for an additional or better weapon. Number 89 presumes that Torres already saw Aaron with a weapon by using the phrase "additional or better weapon." Torres cannot presume that Aaron had a weapon at any point inside the garage, because Torres could not see Aaron's hands. [Torres Decl., ¶74; Torres Dep. 148:14-149:6, 152:22-153:9, 155:13-19, 164:8-11]. And even if Torres would have seen an object in Aaron's hands, Torres speculates that Aaron had the object in his hands to use as a weapon. Aaron could have intended to use the objects in the garage as self-defense from Torres, who had already pointed his gun at Aaron. [Torres Decl., ¶62].

90.     Salinas also saw Siler bending down to grab something but he did not know what Siler grabbed. [Salinas Dep., 72:14-73:19; 74:22-75:6].

**Plaintiffs' Response:** Object because Salinas lacks personal knowledge to have seen Aaron Siler "bend down to grab something." Subject to objection, disagree that Salinas could see Aaron allegedly "bending down to grab something." Salinas could not see Aaron's hands. [Salinas Dep. 86:1-2]. Salinas originally told DCI investigators that Aaron may have grabbed a piece of metal, but later clarified that he does not know what Aaron allegedly grabbed because he was not on the same side of the SUV as Aaron. [Id. 75:16-76:4]. Salinas also admitted that was on the other side of the SUV from Aaron, and therefore "couldn't see to the other side." [Id. 73:14-16].

91. After Torres saw Siler bend down to grab something, Siler looked straight at Torres as if Siler was targeting Torres. [Torres Decl., ¶76].

**Plaintiffs' Response:** Object because the phrase "Siler looked straight at Torres as if Siler was targeting Torres" is vague. Also object because Torres lacks personal knowledge to claim that "Siler looked straight at Torres as if Siler was targeting Torres." Subject to objection, disagree that Torres saw Aaron Siler "bend down to grab something," because Torres could not see Aaron's hands. [Torres Decl., ¶64]. To the extent that number 91 refers to Aaron picking up the plastic bucket, also subject to objection, disagree that Aaron picked up the plastic bucket while he was near the passenger side of the SUV. Aaron had to leave the SUV and go to the entrance of another room inside the garage to pick up the plastic bucket. [Jaimes Dep. 49:11-19]. Torres denies seeing this happen. [Torres Dep. 199:18-200:21].

Also subject to objection, disagree that Aaron Siler "looked straight at Torres as if Siler was targeting Torres." Torres now claims that Aaron was "targeting" him, although Torres never made such a claim to either DCI or Kenosha County District Attorney consulting Attorney Emanuel Kapelsohn. [Jansky Dep. Ex. 77; Kapelsohn Report to DA at pp.4-7 (CITY0002118-2121)]. And prior to fatally shooting Aaron on March 14, 2015, Torres did not know Aaron. [Torres Dep. 9:8-11]. If Torres did not know Aaron, Torres cannot know the meaning of any alleged look in Aaron's face. [Id.].

92.     Torres then saw Siler make a fast, aggressive motion to his right, from near the front passenger-side tire toward the front corner of the SUV. [Torres Decl., ¶77].

**Plaintiffs' Response:**  Object because the phrases "make a fast, aggressive motion to his right" and "toward the front corner of the SUV" are vague. Subject to objection, disagree that Torres saw Aaron Siler make "a fast, aggressive motion to his right" and/or that Aaron's alleged motion was "toward the front corner of the SUV." Torres has admitted that Aaron made a step to the right, while still on the passenger side of the SUV, when Torres started shooting from the driver side in between the front door and the front tire. [[Torres Dep. 169:4-10, 164:15-19; Jansky Dep. 116:2-16; Jansky Dep. Ex. 77 at p.11 (CITY0000346)].

Also subject to objection, to the extent number 92 claims that Aaron Siler was in front of the SUV or at the front of the SUV at the time Torres started shooting, disagree on the basis of the facts set forth below.

The report from the DCI interview of Torres three days after the fatal shooting states that Torres claimed that Aaron was "heading around" the front corner of the SUV at the time he started shooting. [Jansky Dep. Ex. 77 at p.7 (CITY0000342)]. Investigating Agent Jacob Jansky understood Torres' statement to mean that Aaron "had cleared the front of the vehicle and was then coming towards the officer." (Jansky Dep., 88:21-89:1). Torres confirmed Agent Jansky's understanding with an "X" marked in front of the SUV on a diagram of the shooting scene attached to the DCI report, which represents where Torres said that Aaron was at the time of the shooting. [Jansky Dep., 117:19-118:6; Jansky Dep. Ex. 7 at p.11 (CITY0000346)].

Attorney Kapelsohn reviewed the report of Torres' DCI interview, and conducted another interview of Torres on January 15, 2016. [Kapelsohn DA Report, p.1 (CITY0002115), ¶3; p.2 (CITY0002116), ¶4]. Attorney Kapelsohn provided his report to the DA on March 8, 2016. [Id., p.1 (CITY0002115), ¶¶1-2]. The DA report quotes Torres as saying that Aaron "'lunged' around the front of the SUV." [Id., p.5 (CITY0002119), ¶5]. The DA report also states: "The officer (Torres) also said that when Siler came around the front end of the Trailblazer toward him (Torres) . . .." [Id., p.6 (CITY0002120), ¶4].

At his deposition in this case, Attorney Kapelsohn testified as follows: Torres' statement that Aaron "lunged around the front of the SUV" does not mean getting to the front of the SUV where the headlights were. [Kapelsohn Dep. 125:21-25]. Torres' statement that "he (Aaron) came around the front end of the

Trailblazer towards him (Torres)" has a similar meaning as "lunged around the front of the SUV," in that it does not mean that Aaron got to the front of the SUV where the headlights were. [Id. 151:3-13].

In his deposition in this case, Torres did not testify that Aaron Siler "came around" and/or "lunged around" the front of SUV. Instead, Torres testified that Aaron made a step to the right. [Torres Dep. 168:3-5]. In doing so, Aaron did not get past the bumper to the front of the SUV. [Id. 166:3-5]. Torres did not know what Aaron was going to do when he took a step to the right, and just "felt that as if he was coming towards me." [Id. 168:21-169:3]. Aaron made no movements towards Torres, other than the step to the right which Torres assumed meant that Aaron was going to come around the front of the SUV. [Id. 168:3-20]. And Torres testified that it was when Aaron made a step to the right, while still on the passenger side of the SUV and not in front of the SUV, when Torres began firing his gun. [Id. 169:4-10].

Salinas and Jaimes also dispute Torres' original story that Aaron Siler was in front of the SUV at the time Torres fatally shot him. Salinas never saw Aaron come around the front of the SUV. [Salinas Dep. 87:11-13]. Likewise, Jaimes testified that Aaron was on the passenger side of the SUV, not in the front of the SUV, at the time of the shooting. [Jaimes Dep. 52:7-21]. Jaimes also contradicts Torres' claim that Aaron "lunged around" the front of the SUV, because Jaimes never saw Aaron lunge at Torres. [Id. 78:17-19].

The photo of the deceased Aaron Siler on the ground shows that Aaron was on the passenger side of the SUV, not in front of the SUV, when Torres fatally shot him. [Torres Decl., Ex. D]. One of the first responding Kenosha police officers testified that Aaron's body on the passenger side of the SUV is in the same location as where he fell after being shot, except being turned over for handcuffing. [Deposition of Jeffrey Galley 44:13-49:21]. Torres testified that he has no reason to disagree that Aaron's body was found in the same location as where he was fatally shot, except being rolled over for handcuffing. [Torres Dep. 178:15-180:2].

93.     In doing so, Siler was moving away from the open garage door to his left through which he could have tried to escape. [Torres Decl., ¶78].

**Plaintiffs' Response:** Object because the phrase "in doing so" is vague. Also object because Torres lacks personal knowledge for what is set forth in number 93. Subject to objection, disagree. To the extent that number 93 is referring to Aaron Siler's alleged "fast, aggressive motion to his right," Plaintiffs refer to their response to number 92. Also subject to objection, disagree that Torres had any reason to believe Aaron's step to the right was definitively not an escape attempt. Torres testified that he had no idea as to what Aaron was going to do when he made a step to his right. [Torres Dep. 168:17-20].

94.     Torres saw that the sudden aggressive movement was on a path toward him and believed that Siler was moving with a purpose. [Torres Decl., ¶79].

**Plaintiffs' Response:** Object because the phrases "sudden aggressive movement" and "moving with a purpose" are vague. Also object because Torres lacks personal knowledge for what is set forth in number 94. Subject to objection, disagree due to the facts set forth in Plaintiffs' response to number 92.

Also subject to objection, disagree that Aaron moved toward Torres. Jaimes saw that Aaron's movement was towards the SUV, not toward Torres on the other side of the SUV. [Jaimes Dep. 59:6-10]. Jaimes never saw Aaron attempt to go around the SUV to where Torres was located on the other side. [Id. 60:2-7].

And also subject to objection, disagree that Torres has any reason to assume Aaron's purpose. Torres testified that he had no idea as to what Aaron was going to do when he made a step to his right, and that he assumed Aaron was going to come around the front of the SUV. [Torres Dep. 168:17-20].

95.    Torres felt that Siler was, instead of looking for a way to escape, advancing on him. [Torres Decl., ¶80].

**Plaintiffs' Response:** Object because the word "advancing" is vague. Also object because Torres lacks personal knowledge for what is set forth in number 95. Subject to objection, disagree that Torres had any reason to "feel" that Aaron Siler was not looking for a way to escape and/or was "advancing on him." Torres testified that he had no idea as to what Aaron was going to do when he made a step to his right, and just assumed Aaron was going to come around the front of the SUV. [Torres Dep. 168:17-20].

96.    At that point, there were only a few seconds or less between the time that Torres saw the pipe against Siler's arm and when Siler moved aggressively toward Torres. [Torres Decl., ¶81].

**Plaintiffs' Response:**    Object because the phrase "moved aggressively" is vague. Also object because Torres lacks personal knowledge to claim that Aaron Siler "moved aggressively."

Subject to objection, disagree that Torres had any reason to believe that he saw a "pipe" against Aaron Siler's arm. The object was an attached car floor jack handle. [Jaimes Dep. 34:1-7].

Also subject to objection, disagree that Aaron "moved aggressively toward Torres," due to the facts set forth in Plaintiffs' responses to numbers 92-95.

And also subject to objection, disagree that "there were only a few seconds or less" between the time Torres saw the attached car jack handle near Aaron's forearm and when Torres started shooting. Other events occurred in between. After Aaron grabbed and let go of the attached car floor jack handle, Jaimes saw Aaron go away from the SUV to the entrance of another room in the garage to pick up a plastic bucket. [Jaimes. Dep. 49:11-19]. Jaimes witnessed Aaron return to the SUV, where he and Torres may have continued engaging the cat-and-mouse on opposite sides of the SUV. [Id. 51:15-24, 73:24-74:1]. Jaimes claims that Aaron was holding the bucket sideways, and then over his shoulder as if he was going to throw the bucket, even though Jaimes never saw the bucket come out of Aaron's

hands and go forward. [Id. 54:12-56:25]. It was then that Torres began firing his gun. [Id. 57:1-5].

97.     There was approximately 10-12 feet between Siler and Torres at the time of the shooting. [Torres Decl., ¶82; Salinas Dep., 105:21-106:4; Jaimes Dep., 57:19-58:2, 60:17-22].

**Plaintiffs' Response:** Agree.

98.     Given that only the front end of the SUV separated Torres and Siler, it would have taken the 6'4", 243 pound Siler only a couple of seconds, at most, to reach the 5'7", 155 pound Torres to try to overpower Torres. [Torres Decl., ¶83].

**Plaintiffs' Response:** Object because Torres lacks the personal knowledge to assume that Aaron Siler was going around the front of the SUV, that Aaron could go around the SUV in "only a couple of seconds" and that Aaron would "try to overpower Torres." Subject to objection, disagree that Torres had any reason to believe that Aaron was going around the front of the SUV to try to overpower Torres, due to the facts set forth in Plaintiffs' response to numbers 92-95. Also subject to objection, disagree that Torres had any reason to assume that it would only take two seconds for Aaron to go from the passenger side of the SUV, around the front of the SUV, and then to the driver side of the SUV where Torres was standing in between the front door and the front tire. [Torres Dep. 164:15-19; Jansky Dep. 116:2-16; Jansky Dep. Ex. 77 at p.11 (CITY0000346)]. Prior to fatally shooting Aaron on March 14, 2015, Torres did not know Aaron. [Torres Dep. 9:8-11]. If Torres did not know Aaron, he also did not know Aaron's health status,

physical condition and level of fatigue inside the garage, meaning Torres did not know how fast Aaron could have gone around the SUV. [Id.]

99. The photo bates-numbered as CITY0000754, shows a view from the driver's side of the SUV across the hood of the SUV where Torres stood at the time of the shooting, though Torres was standing to the right and closer to the SUV than the view shown in the photo. [Torres Decl., ¶84, Ex. E].

**Plaintiffs' Response:** Object because number 99 is vague and self-contradictory, claiming that the photo shows the view from Torres' shooting location, but then admitting that Torres was actually standing in a different location. Subject to objection, disagree. Torres was on the driver side of the SUV, in between the front door and the front tire, at the time he fatally shot Aaron Siler. [Torres Dep. 164:15-19; Jansky Dep. 116:2-16; Jansky Dep. Ex. 77 at p.11 (CITY0000346)].

100. Torres, Salinas and Jaimes agree that Siler made a movement forward toward Torres at the time of the shooting. [Torres Decl., ¶79; Salinas Dep., 107:7-111:25; Jaimes Dep., 57:1-58:2].

**Plaintiffs' Response:** Object because the phrase "a movement forward" is vague. Subject to objection, disagree that Torres had any reason to assume the Aaron Siler made a movement forward toward him, due to the facts set forth in Plaintiffs' response to numbers 92-95.

Also subject to objection, disagree that Jaimes said that Aaron made a movement toward Torres. Jaimes saw that Aaron's movement was towards the

SUV, not toward Torres on the other side of the SUV. [Jaimes Dep. 59:6-10]. Jaimes never saw Aaron attempt to go around the SUV to where Torres was located on the other side. [Id. 60:2-7].

Also subject to objection disagree that Salinas saw that Aaron made a movement toward Torres. Salinas may claim to have seen Aaron make a throwing movement toward Torres, but Salinas also admitted that was on the other side of the SUV from Aaron, and therefore "couldn't see to the other side." [Salinas Dep. 73:14-16].

101.    Torres felt threatened because he did not know for sure what Siler had grabbed but believed that Siler may still have had the pipe as that was the last thing he had seen him grab. [Torres Decl., ¶85].

**Plaintiffs' Response:**    Disagree that Torres had any reason to "feel threatened" and to assume that Aaron Siler grabbed a pipe. Torres never saw Aaron grab anything inside the garage, because Torres could not see Aaron's hands. [Torres Decl., ¶74; Torres Dep. 148:14-149:6, 152:22-153:9, 155:13-19, 164:8-11]. And disagree that Torres reasonably believed that Aaron grabbed a "pipe." The object was an attached car floor jack handle. [Jaimes Dep. 34:1-7].

Also disagree that Torres reasonably believed that Aaron Siler had the pipe when Torres started shooting. Torres claims to believe that Aaron was armed with a pipe at one point during the cat-and-mouse by the SUV, even though he could not see Aaron's hands, because he could see a black, cylindrical object pressed against Aaron's forearm. [Torres Decl., ¶¶64-66]. After seeing the object, Torres

claims that Aaron bent down and then came back up. [Torres Dep. 164:4-11]. Torres admits that, when Aaron came back up, Torres did not see Aaron's hands and also no longer saw the black cylindrical object pressed against Aaron's forearm. [Id. 164:4-14]. Torres therefore had no reason to believe that Aaron was armed with a pipe. [Torres Decl., ¶¶64-66].

102.  Based on his vantage point, Jaimes was actually able to see Siler grab a bucket prior to the shooting. [Jaimes Dep., 46:17-18, 49:11-13].

**Plaintiffs' Response:** Agree, except for noting that the bucket was made of plastic. [Jaimes Dep. 46:17-20].

103.  Jaimes, who was to the left of Torres with a better view of the front of the vehicle, recalls that Siler grabbed a bucket and tried to throw it at Torres and that Siler was at the front corner of the car when he did so. [Jaimes Dep., 50:12-15, 52:3-12, Ex. 33].

**Plaintiffs' Response:** Object because the phrases "a better view of the front of the vehicle" and "front corner of the car" are vague. Also object because Jaimes lacks personal knowledge to claim that Aaron Siler tried to throw the plastic bucket at Torres. Subject to objection, disagree. Jaimes may claim that Aaron tried to throw the plastic bucket at Torres, but Jaimes also acknowledged that he did not know what Aaron's intentions were inside the garage. [Jaimes Dep. 68:10-20]. And the circle by the passenger front tire represents where Jaimes said Aaron was when Torres started shooting, which is on the passenger side of the SUV, not the front side. [Id. 52:3-12, Ex. 33].

104. Salinas, who could not see what Siler had in his hands, recalls that Siler made a throwing motion moving toward Torres which happened very quickly and believed that Siler intended to throw something at Torres. [Salinas Dep., 76:10-18].

**Plaintiffs' Response:** Object because the phrase "throwing motion moving toward Torres which happened very quickly" is vague. Also object because Salinas lacks personal knowledge to claim that Aaron Siler intended to throw something at Torres. Subject to objection, agree that Salinas could not see what, if anything, Aaron had in his hands. Also subject to objection disagree that Salinas saw Aaron make "a throwing motion moving toward Torres." Salinas may claim to have seen that, but Salinas also admitted that was on the other side of the SUV from Aaron, and therefore "couldn't see to the other side." [Salinas Dep. 73:14-16].

105. Torres and Salinas were concerned that if Siler got to Torres, Torres would not be able to defend himself because of Siler's size and Torres' observations of Siler's physical ability. [Torres Decl., ¶86; Salinas Dep., 134:17-135:5].

**Plaintiffs' Response:** Object because number 105 is speculation based upon an incomplete and vague hypothetical situation. Also object because Torres and Salinas lack personal knowledge to assume what is set forth in number 105.

Subject to objection, disagree that Torres had any reason to assume that Aaron Siler was going to get to Torres, due to the facts set forth in Plaintiffs' response to numbers 92-96. Also subject to objection, disagree that Salinas had

any reason to assume that Aaron was going to get to Torres, due to the facts set forth in Plaintiffs' response to number 104.

And also subject to objection, disagree Torres and Salinas had any reason to be concerned that Torres would not be able to defend himself, because Torres had already drawn his gun and was pointing his gun at Aaron. [Torres Decl., ¶62; Torres Dep. 127:7-128:2, 153:10-25].

106. Plaintiffs' expert, William Harmening, conceded at this deposition, if Siler had overpowered Torres and gotten his gun, "chances are" Torres would die. [Deposition of William Harmening ("Harmening Dep."), 133:4-13].

**Plaintiffs' Response:** Object because number 106 is speculation based upon an incomplete and vague hypothetical situation. Subject to objection, disagree. Mr. Harmening testified that his response of "chances are" Torres may die depended upon the additional hypothetical fact that other police officers were not close by. [Harmening Dep. 133:4-13]. In this case, the fact is that several Kenosha police officers were close by, arriving at the garage seconds after the fatal shooting of Aaron Siler. [Torres Dep. 202:3-20; Jaimes Dep. 67:6-16]. Mr. Harmening also testified that the hypothetical question's assumption that Aaron could have overpowered Torres and gotten Torres' gun failed to include the fact that police officers such as Torres are trained in weapon retention. [Harmening Dep. 133:4-16].

107. Not only was Siler much bigger than Torres, Torres was very fatigued at the time, having just run hundreds of years wearing body armor and a

duty belt with police equipment, while calling out commands to Siler and communicating with dispatch.[Torres Decl., ¶87].

**Plaintiffs' Response:**  Object because the phrases "much bigger" and "very fatigued" are vague. Subject to objection, agree that Aaron Siler was 6'4" and 243 pounds. [Declaration of Brian Peterson, M.D., dated November 15, 2018, ¶3].

Also subject to objection, agree that Torres now claims to have been fatigued inside the garage. Torres never told the DCI he was fatigued during his interview three days after fatally shooting Aaron. [Jansky Dep. Ex. 77]. Likewise, when interviewed on January 15, 2016 by Attorney Emanuel Kapelsohn, a Kenosha County District Attorney consultant, Torres said nothing about being fatigued. [Kapelsohn Report to DA pp.4-7 (CITY002118-2121)].

 Also subject to objection, agree that Torres was calling out commands to Aaron, except for noting that Torres was yelling the commands at Aaron. [Torres Dep. 128:16-129:3; Jaimes Dep. 33:1-7].

And also subject to objection, agree that Torres was communicating with dispatch while he was chasing Aaron Siler, except for noting that other responding Kenosha police officers heard that Torres sounded either distressed or under stress when he was communicating with dispatch. [Deposition of Paul J. Chase 31:8-22; Deposition of Anne M. Levinstein 46:11-25; Deposition of Leslie C. Zielsdorf 25:10-13].

108.  Torres could not back up as he did not know what was behind him in the auto body repair shop nor did Torres know exactly where Salinas and Jaimes were. [Torres Decl., ¶88].

**Plaintiffs' Response:**  Object because Torres lacks personal knowledge to claim that he "could not back up" inside the garage. Subject to objection, disagree. During the cat-and-mouse by the SUV, Torres could have looked behind him and then backed up. [Torres Decl., ¶61]. In addition, Torres claims he knew that Jaimes was to his left and Salinas was behind him. [Torres Decl., ¶60]. If Torres wanted a more exact location for Salinas and Jaimes, Torres could have looked during the cat-and-mouse by the SUV. [Torres Decl., ¶61].

109.  Torres was not only threatened by Siler's actions for his own safety but Torres also felt that the safety of Salinas and Jaimes – who he had a duty to protect and was trained to protect – was in jeopardy. [Torres Decl., ¶89].

**Plaintiffs' Response:**  Object because the phrase "Siler's actions" is vague. Subject to objection, disagree due to the facts set forth in Plaintiffs' response to numbers 92-96. And, as stated in Plaintiffs' statement of additional fact numbers 14-15, Torres could have fulfilled his duty to protect and complied with accepted standards of police practice when he entered the garage by ordering Salinas and Jaimes out of the garage, instead of immediately yelling for and at Aaron. [Declaration of William Harmening, ¶¶2-11].

110.  Jaimes and Salinas continued to feel like they were in danger from Siler. [Salinas Dep., 130:13-131:7; Jaimes Dep., 75:8-16].

**Plaintiffs' Response:** Object because number 110 is irrelevant speculation. Subject to objection, disagree that Jaimes and Salinas had any reason to "feel like they were in danger" from Aaron Siler, due to the facts set forth above.

111. The witnesses agree that in shooting Siler, Torres was defending himself, Salinas and Jaimes. [Torres Decl., ¶90; Salinas Dep., 136:5-15; Jaimes Dep., 74:20-75:25].

**Plaintiffs' Response:** Object because number 111 is an argument masquerading as a proposed finding of fact. Subject to objection, disagree that Torres was defending himself, Salinas and/or Jaimes, for reasons fully set forth in the Plaintiffs' memorandum in opposition to Torres' summary judgment motion.

112. Torres was told that he fired his gun seven times, hitting Siler with six bullets. [Torres Decl., ¶91].

**Plaintiffs' Response:** Agree, except for noting that Torres had to be told that he fired seven times at Aaron Siler. Torres told DCI investigators and Kenosha County District Attorney consulting Attorney Emanuel Kapelsohn that he did not know how many gunshots he fired at Aaron at the time of the fatal shooting. [Jansky Dep. 91:15-18; Jansky Dep. Ex. 77 at p.8 (CITY0000343), ¶3; Kapelsohn DA Report at p.6 (CITY0002120), ¶2]. Torres incorrectly believed that he fired three shots at Aaron. [Jansky Dep. 91:15-18; Jansky Dep. Ex. 77 at p.8 (CITY0000343), ¶3; Kapelsohn DA Report p.6 (CITY0002120), ¶2]. Torres' failure to know how many gunshots he fired at Aaron contradicts City of Kenosha policy and accepted standards of police practice, which both require police officers to be

accountable for every gunshot. [Deposition of City of Kenosha Federal Rule of Civil Procedure 30(b)(6) designee Eric Larsen 152:21-153:2; Harmening Dep. 186:14-188:11].

113.    The medical examiner confirmed that Siler was shot six times, all in the upper torso, indicating that Siler was upright at the time he was shot. [Peterson Decl., ¶4].

**Plaintiffs' Response:**  Agree that Torres shot Aaron Siler six times and that Aaron was upright when Torres began firing his gun.  Agree that all six shots struck Aaron in the torso, except for noting that three shots were to Aaron's right shoulder and three shots were to Aaron's chest. [Autopsy Report pp.3-4 (CITY000566-567)]. Agree that Aaron was upright when Torres fired the three gunshots that struck Aaron in the right shoulder. [Declaration of Brian Peterson, dated December 19, 2018, ¶11]. Disagree that Aaron was upright when Torres fired the three shots that struck Aaron in the chest. Milwaukee County Medical Examiner Brian Peterson, M.D. found that the three shots to Aaron's chest had a downward trajectory. [Autopsy Report pp.3-4 (CITY000566-567)]. Aaron was 6'4," and Torres is 5'7." [Torres Decl., ¶¶11-12]. For the nine-inch shorter Torres to fire downward shots that struck Aaron in the chest, Aaron could not have been upright. Instead, Dr. Peterson stated that Aaron may have been falling, leaning or running at the time Torres shot him in the chest three times. [Declaration of Brian Peterson, dated December 19, 2018, ¶12]. Torres testified that Aaron fell

backwards at some point while he was shooting, but Torres could not say after which gunshot Aaron fell. [Torres Dep. 190:12-15, 349:11-24].

114.   Torres fired the shots successively without pause or delay between the shots. [Torres Decl., ¶92; Salinas Dep., 103:3-14; Jaimes Dep., 61:8-10].

**Plaintiffs' Response:**  Agree.

115.   As he was trained to do, Torres fired until he perceived Siler was no longer a threat. [Torres Decl., ¶93].

**Plaintiffs' Response:**   Object because number 115 is an argument masquerading as a proposed finding of fact. Subject to objection, disagree that Aaron Siler was a threat for reasons fully explained in the Plaintiffs' memorandum in opposition to Torres' summary judgment motion. Also subject to objection, assuming for the sake of argument that Aaron was a threat at the time Torres began shooting, disagree that Aaron was a threat when Torres fired the three gunshots that struck Aaron in the chest, for reasons fully explained in the Plaintiffs' memorandum in opposition to Torres' summary judgment motion.

116.   It took under two seconds for Torres to fire seven shots, with six hitting Siler. [Harmening Dep., 53:2-12].

**Plaintiffs' Response:**   Object because number 116 misrepresents Mr. Harmening's deposition testimony. Subject to objection, disagree. Mr. Harmening testified that seven gunshots could be fired in less than two seconds, but he specifically stated that he had no opinion as to how long it took Torres to fire the seven gunshots at Aaron Siler. [Harmening Dep. 53-2-12].

117.    Siler died from gunshot wounds. [Dkt. No. 1, ¶402].

**Plaintiffs' Response:**   Agree that Aaron Siler died from the three gunshot wounds to his chest, but disagree that Aaron died from the three gunshot wounds to his right shoulder. [Declaration of Stephen Hargarten, ¶6].

118.    Before Torres was questioned in the investigation which followed, Salinas and Jaimes never told Torres what they saw happen in the garage that morning. [Torres Decl., ¶94; Salinas Dep., 121:5-19; Jaimes Dep., 64:17-65:4].

**Plaintiffs' Response:**  Agree.

*/s/Jonathan S. Safran*
Jonathan S. Safran
Wisconsin State Bar No.:  1000881
Jerome A. Konkel
Wisconsin State Bar No.:  1000149
Jeffrey D. Patza
Wisconsin State Bar No.:  1030512
SAMSTER, KONKEL, & SAFRAN, S.C.
Attorneys for Plaintiffs
1110 North Old World Third Street
Suite 405
Milwaukee, WI 53203
Phone:  (414)224-0400
E-mail:  jsafran@skslawyers.com
Email:  jkonkel@skslawyers.com
Email:  jpatza@skslawyers.com

Phillip R. Godin
Wisconsin State Bar No.:  1018592
GODIN GERAGHTY PUNTILLO CAMILLI, S.C.
Attorneys for Plaintiffs
6301 Green Bay Road
Kenosha, WI 53142
Phone:  (262) 465-4094
E-mail:  phil@gglawyers.com

Date:  December 28, 2018.