# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**GABRIELLA SILER,**
   *a minor, by her mother and guardian, Ikesha King,* and
**ESTATE OF AARON SILER,**
  *by special administrator, Lisa Cerna,*

      Plaintiffs,

    **v.**                          **Case No. 17-CV-1324**

**CITY OF KENOSHA** and
**PAUL (PABLO) E. TORRES,**

      Defendants.

---

## DECISION AND ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Aaron Siler was shot and killed by Kenosha Police Officer Paul (Pablo) Torres on March 14, 2015, after Siler fled from an attempted traffic stop. The shooting occurred after Officer Torres located Mr. Siler hiding in an auto body repair shop. With the two men separated by a parked SUV, Mr. Siler refused to get on the ground and appeared to be reaching for something located on the repair shop's floor. When Mr. Siler made a move toward the front of the SUV and away from an open, overhead garage door, Officer Torres fired seven shots, believing that Siler was about to attack him.

Two-and-a-half years later, Mr. Siler's daughter and estate sued Officer Torres under 42 U.S.C. § 1983 for using unconstitutionally excessive force. Officer Torres has moved for summary judgment, arguing that his use of deadly force was

reasonable and that he is otherwise entitled to qualified immunity. Because a reasonable jury could find that the use of deadly force was objectively unreasonable in this case, Officer Torres is not entitled to summary judgment on the plaintiffs' excessive-force claim. However, the plaintiffs have failed to establish that Officer Torres violated Mr. Siler's clearly established constitutional rights. Officer Torres is therefore entitled to qualified immunity from the plaintiffs' excessive-force claim, and his summary-judgment motion will be granted.

I.    **Factual Background**

At approximately 9:35 a.m. on March 14, 2015, City of Kenosha Police Officer Pablo Torres was on vehicle patrol when dispatch requested assistance apprehending Aaron Siler. *See* Defendant Torres' Reply to Defendant Torres' Proposed Findings of Fact ¶ 8, ECF No. 64. The 911 dispatcher told Officer Torres that Mr. Siler was wanted for strangulation and suffocation. Def.'s Facts ¶ 9.[1] The dispatcher also told Officer Torres that Mr. Siler had taken a vehicle without consent and that Officer Torres should use caution because Mr. Siler was known to have violent tendencies. Def.'s Facts ¶ 10. Officer Torres indicated that he was in the vicinity and could handle the call. Def.'s Facts ¶ 11.

Officer Torres used his squad's computer to look up information about Mr. Siler. Def.'s Facts ¶ 12. He confirmed the information from dispatch and learned

---

[1] Despite what the dispatcher said, Mr. Siler did not have an active warrant for strangulation and suffocation. Mr. Siler was on probation for a domestic assault by strangulation and suffocation, and he had a warrant for violating the terms of his probation. *See* Exhibit B to Declaration of Jonathan S. Safran, ECF No. 56-2 at 3–4; Exhibit D to Safran Decl., ECF No. 56-4 at 4.

that Mr. Siler was 6′4″ and 26 years old. Def.'s Facts ¶¶ 12–13. At the time, Officer Torres was 5′7″ tall, weighed 155 pounds, and was 42 years old. Def.'s Facts ¶¶ 7, 14.

As Officer Torres approached a stop light, Mr. Siler passed right in front of him. Def.'s Facts ¶ 15. Officer Torres activated his emergency lights and sirens, but Mr. Siler did not stop. Def.'s Facts ¶¶ 16–19. Instead, Mr. Siler sped off, traveling over 80 miles per hour, driving on the wrong side of the road, and ignoring stop signs and traffic controls. *See* Def.'s Facts ¶¶ 20–23. The vehicle chase ended after three minutes when Mr. Siler sideswiped another vehicle and crashed his car. Def.'s Facts ¶¶ 25–26.

Mr. Siler abandoned his vehicle and fled on foot. Def.'s Facts ¶ 27. Officer Torres gave chase, noting that Mr. Siler was much taller and heavier than he was. Def.'s Facts ¶¶ 28–29. During the chase, Officer Torres yelled out, "stop," "police," and "get on the ground." Def.'s Facts ¶ 34. Mr. Siler did not obey any of the commands. Def.'s Facts ¶ 35. Rather, he continued to run, scaling two fences along the way. Def.'s Facts ¶¶ 32–33. Officer Torres lost sight of Mr. Siler for a bit as Siler outpaced him. Def.'s Facts ¶ 40. Eventually, Officer Torres located Mr. Siler and followed him toward an auto body repair shop. Def.'s Facts ¶¶ 40, 42.[2] Juan Carlos Salinas was standing near the repair shop's garage entrance on the south side of

---

[2] A diagram was subsequently created to depict where Mr. Siler's vehicle crashed and the approximate route of the foot pursuit. *See* Def.'s Facts ¶ 41 (citing Exhibit A to Declaration of Pablo E. Torres, ECF No. 48-1).

the building. Def.'s Facts ¶ 44. Mr. Salinas gestured to Officer Torres that the person he was looking for was inside the garage. Def.'s Facts ¶ 45.

Inside the garage were two vehicles: a pick-up truck parked straight ahead, and an SUV parked to the right at an angle. *See* Exhibit C to Torres Decl., ECF No. 48-3. Upon entering the garage, Officer Torres observed another man, Antonio Salinas Jaimes, holding a baseball bat. Def.'s Facts ¶¶ 47–48. Officer Torres yelled, "Where is he at?" Plaintiffs' Statement of Additional Facts ¶ 4, ECF No. 55. Mr. Salinas indicated that the man was hiding in a back room. *See* Exhibit G to Safran Decl., ECF No. 56-7 at 8–9. Officer Torres pulled out his service weapon,[3] *see* Safran Decl., Ex. G at 9, and yelled repeatedly at Mr. Siler to come out, Pls.' Facts ¶ 4.

Mr. Siler eventually exited the back room and ran along the passenger side of the SUV toward the open garage door; however, he stopped when Officer Torres blocked his path. *See* Safran Decl., Ex. G at 12; *see also* Exhibit F to Safran Decl., ECF No. 56-6 at 9. While standing near the back-driver side of the SUV, Officer Torres ordered Mr. Siler to get on the ground. Def.'s Facts ¶ 60. Mr. Siler didn't comply. Def.'s Facts ¶ 63. And so began a standoff between Officer Torres and Mr. Siler, who were standing on opposite sides of the SUV. Def.'s Facts ¶ 61. When Officer Torres moved toward the front-driver side of the SUV, Mr. Siler moved to the back-passenger side; when Officer Torres moved to the back, Mr. Siler moved to the front, always very quickly. Def.'s Facts ¶ 64. All the while, Officer Torres was ordering Mr. Siler to get on the ground, Def.'s Facts ¶ 61, and the garage door

---

[3] Officer Torres also was equipped with a Taser and pepper spray. Pls.' Facts ¶ 1.

remained open, *see* Def.'s Facts ¶ 65; *see also* Exhibit B to Torres Decl., ECF No. 48-2 (photograph depicting back-passenger side of SUV and open garage door).

After going back-and-forth several times, the two men stopped near the front fender of the SUV, separated only by the vehicle's hood—Officer Torres on the driver side, and Mr. Siler on the passenger side. *See* Def.'s Facts ¶¶ 68–69; *see also* Torres Decl., Ex. C. At that time, Mr. Jaimes and Mr. Salinas were in the same room of the garage as Officer Torres, Mr. Siler, and the SUV. Def.'s Facts ¶ 70. Mr. Jaimes was somewhere to Officer Torres's left, and Mr. Salinas was somewhere behind Officer Torres. *Id.* According to Officer Torres and Mr. Salinas, Mr. Siler looked angry. *See* Def.'s Facts ¶ 71.

Officer Torres pointed his gun at Mr. Siler and ordered him to get on the ground. Def.'s Facts ¶ 72. Mr. Siler didn't comply, yelling, "fuck you," "no," and "shoot me." *Id.* He also began looking to the ground and then up at Officer Torres. Def.'s Facts ¶ 73. Officer Torres could not see Mr. Siler's hands. Def.'s Facts ¶ 74. Mr. Siler then bent over and, when he stood up, Officer Torres could see a black, cylindrical object pressed against Mr. Siler's forearm. Def.'s Facts ¶ 75. Officer Torres believed at the time that the object was a steel pipe; he later learned it was the handle of a floor jack, to which it was attached. *See* Def.'s Facts ¶¶ 76, 80–82; *see also* Exhibit D to Torres Decl., ECF No. 48-4 (photograph depicting floor jack in foreground); Exhibit A to Declaration of Emanuel Kapelsohn, ECF No. 67-1

(photograph depicting the handle).[4] Officer Torres still could not see Mr. Siler's hands. Def.'s Facts ¶ 75. He ordered Mr. Siler to "drop it" and "get on the ground." Def.'s Facts ¶ 77. Mr. Siler continued to shout, "fuck you," "no," and "shoot me." Def.'s Facts ¶¶ 78–79.

Mr. Siler bent down again as if he was grabbing something. Def.'s Facts ¶¶ 87, 90. But Officer Torres still could not see Mr. Siler's hands. Def.'s Facts ¶ 88.[5] Mr. Siler looked straight at Officer Torres. Def.'s Facts ¶ 91. Mr. Siler then took a step to his right, toward the front-passenger corner of the SUV (and away from the open garage door) but not past its front bumper. *See* Def.'s Facts ¶¶ 92–93, 100. Officer Torres shot at Mr. Siler. *See* Def.'s Facts ¶¶ 111–17. The entire sequence inside the garage lasted less than thirty seconds. Def.'s Facts ¶ 59.

Officer Torres was later told that he fired his gun seven times—successively without pause or delay between shots—hitting Mr. Siler with six bullets: three in the right shoulder and three in the chest. Def.'s Facts ¶¶ 112–14.[6] The medical examiner indicated that the shots to the shoulder were consistent with Mr. Siler being upright, Pls.' Facts ¶ 35, but the shots to the chest had a downward

---

[4] Mr. Salinas claims that he saw Mr. Siler bend over as if he was attempting to lift something and that he heard the sound of metal hitting the garage floor. *See* Def.'s Facts ¶ 80. Mr. Jaimes claims that he saw Mr. Siler grab the handle of the floor jack. *See* Def.'s Facts ¶¶ 81–82.

[5] Mr. Jaimes claims that he saw Mr. Siler grab a plastic bucket and try to throw it at Officer Torres. *See* Def.'s Facts ¶¶ 102–03. Mr. Salinas also claims to have seen Mr. Siler make throwing motion toward Officer Torres. Def.'s Facts ¶ 104.

[6] Officer Torres's service weapon was capable of firing seven times in under two seconds. *See* Def.'s Facts ¶ 116.

trajectory, *see* Pls.' Facts ¶ 36; Def.'s Facts ¶ 113. There was approximately ten to twelve feet between Officer Torres and Mr. Siler at the time of the shooting. Def.'s Facts ¶ 97; *see* Exhibit E to Torres Decl., ECF No. 48-5 (photograph depicting front-driver side of SUV). Mr. Siler died from the gunshot wounds. Def.'s Facts ¶ 117.

## II. Procedural Background

On September 28, 2017, Mr. Siler's minor daughter and estate filed this action under 42 U.S.C. § 1983 against the City of Kenosha and Officer Torres. *See* Federal Complaint, ECF No. 1. The matter was randomly assigned to this Court, and all parties consented to magistrate judge jurisdiction. *See* Consent to Proceed Before a Magistrate Judge, ECF Nos. 7, 8 (citing 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b)). The plaintiffs claim that Officer Torres used excessive force against Mr. Siler and deprived Mr. Siler's daughter of the love, comfort, society, and companionship of her father. Compl. ¶¶ 431–37. The plaintiffs also claim that the excessive force occurred as a direct result of the City's unconstitutional policies. Compl. ¶¶ 442–59. However, the claims against the City have been bifurcated for discovery and trial. *See* Minute Sheet for Telephonic Motion Hearing, ECF No. 27.

On November 20, 2018, Officer Torres filed a motion for summary judgment on the plaintiffs' excessive-force claim. *See* Defendant Paul Torres' Summary Judgment Motion, ECF No. 45. That Motion is now fully briefed and ready for disposition. *See* Defendant Paul Torres' Brief in Support, ECF No. 47; Plaintiffs' Memorandum of Law in Opposition to Summary Judgment Motion, ECF No. 53; Defendant Paul Torres' Reply Brief, ECF No. 63.

### III.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A moving party "is 'entitled to a judgment as a matter of law'" when "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Still,

> a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* (internal quotation marks omitted).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *See Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (citing *Liberty Lobby*, 477 U.S. at 255). "However, [the court's] favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Fitzgerald v.*

*Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (quoting *Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 306 (7th Cir. 2012)). That is, "to survive summary judgment, the non-moving party must establish some genuine issue for trial 'such that a reasonable jury could return a verdict' in her favor." *Fitzgerald*, 707 F.3d at 730 (quoting *Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 822 (7th Cir. 2011)).

## IV.    Discussion

Officer Torres seeks summary judgment, arguing that he did not use excessive force against Mr. Siler and that he is otherwise entitled to qualified immunity from any such liability.

### A.  Excessive force

The plaintiffs claim that Officer Torres, while acting under color of state law, violated Mr. Siler's constitutional rights when he shot and killed Siler.

#### 1.  Legal standards

A plaintiff is entitled to relief under 42 U.S.C. § 1983 only if he demonstrates that "(1) he was deprived of a right secured by the Constitution or laws of the United States; and (2) the deprivation was visited upon him by a person or persons acting under color of state law." *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009) (citing *Kramer v. Village of North Fond du Lac*, 384 F.3d 856, 861 (7th Cir. 2004)).

"[A]ll claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."

*Graham v. Connor*, 490 U.S. 386, 395 (1989). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). Courts engaging in this balancing test generally consider three factors: (1) "the severity of the crime at issue"; (2) "whether the suspect poses an immediate threat to the safety of the officers or others"; and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citing *Garner*, 471 U.S. at 8–9).

The reasonableness inquiry is an objective one, examining "whether the officer's actions are objectively reasonable in light of the totality of the facts and circumstances confronting him . . . , without regard for consideration of the officer's subjective intent or motivations." *Estate of Williams v. Ind. State Police Dep't*, 797 F.3d 468, 473 (7th Cir. 2015) (citing *Graham*, 490 U.S. at 397; *Miller v. Gonzalez*, 761 F.3d 822, 828–29 (7th Cir. 2014); *Fitzgerald*, 707 F.3d at 733). As such, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)). This calculus "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and

rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

"It is well established that '[a] police officer's use of deadly force constitutes a seizure within the meaning of the Fourth Amendment.'" *McKinney v. Duplain*, 463 F.3d 679, 684 (7th Cir. 2006) (quoting *Scott v. Edinburg*, 346 F.3d 752, 755 (7th Cir. 2003)). "[I]t is reasonable for a law enforcement officer to use deadly force if an objectively reasonable officer in the same circumstances would conclude that the suspect posed a threat of death or serious physical injury to the officer or to others." *Williams*, 797 F.3d at 473 (quoting *Marion v. City of Corydon, Ind.*, 559 F.3d 700, 705 (7th Cir. 2009)). "Thus, 'when an officer believes that a suspect's actions places him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force.'" *McKinney*, 463 F.3d at 684 (quoting *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988)).

### 2. Legal analysis

Officer Torres argues that the undisputed facts show that his use of deadly force was objectively reasonable under the Fourth Amendment. The Court respectfully disagrees. Viewing the facts in the light most favorable to the plaintiffs, a reasonable jury could find that it was unreasonable for Officer Torres to conclude that Mr. Siler posed a threat of death or serious physical injury at the time he was shot.

The encounter started when Officer Torres attempted to conduct a traffic stop of Mr. Siler, believing that he had committed a violent felony—strangulation and suffocation—and had taken the vehicle without consent. Mr. Siler did not stop when Officer Torres activated his emergency lights or sirens. Instead, Mr. Siler fled at a high rate of speed, driving recklessly and committing several traffic violations. The high-speed chase ended when Mr. Siler lost control of his vehicle, sideswiped another car, and crashed. But Mr. Siler still did not stop. He fled on foot, ignoring Officer Torres's repeated commands to "stop" and "get on the ground." Mr. Siler then attempted to lose Officer Torres by hiding inside an auto body repair shop occupied by two innocent bystanders (Mr. Salinas and Mr. Jaimes). Officer Torres entered the shop's open garage, drew his gun, and ordered Mr. Siler out from a back room. Mr. Siler eventually exited his hiding spot and ran alongside a parked SUV toward the open garage door, but he was cut off by Officer Torres. Up until this point, Mr. Siler's strategy was unequivocal: avoid apprehension.

Officer Torres maintains that Mr. Siler's tactics changed from flight to fight once he was corned inside the shop. Officer Torres and Mr. Siler were separated by an SUV, with Officer Torres on the driver side and Mr. Siler on the passenger side (and closer to the open garage door). Mr. Siler, with a gun pointed directly at him at close range, refused Officer Torres's commands to get on the ground. He yelled at the officer, "fuck you," "no," and "shoot me." Mr. Siler then reached down and attempted to grab the metal handle of a floor jack. Officer Torres ordered Mr. Siler to "drop it" and "get on the ground." Mr. Siler reached down again as if he was

attempting to grab something, but his hands were obscured from Officer Torres's

view by the hood of the SUV. According to Officer Torres, Mr. Siler then made a

sudden, aggressive move to his right toward the front-passenger corner of the SUV

and away from the open garage door. Officer Torres maintains that he perceived

Mr. Siler—who was significantly bigger and younger than Officer Torres—to be in

"attack mode," so he fired his gun at Siler while he was about ten to twelve feet

away.

The plaintiffs argue that it was unreasonable for Officer Torres to assume

that Mr. Siler posed an imminent threat when he began firing his gun. According to

the plaintiffs, Officer Torres had no reason to believe that Mr. Siler was armed with

a pipe or any other weapon, as Torres admitted he couldn't see Siler's hands and

Torres never saw Siler threaten him with a weapon. The plaintiffs similarly

maintain that Officer Torres speculated that Mr. Siler's single step to his right

signaled that he was on his way around the SUV to attack Torres.

The Court finds that the plaintiffs have presented sufficient evidence to

create a genuine issue of material fact as to the objective reasonableness of Officer

Torres's belief that Mr. Siler posed an immediate threat at the time he was shot.

Officer Torres shot Mr. Siler while he was still on the opposite side of the SUV and

before he had crossed the threshold of the vehicle's front bumper. It is undisputed

that Mr. Siler refused Officer Torres's commands to get on the ground. But prior to

taking a step toward the front of the SUV, all of Mr. Siler's actions were consistent

with flight, not a physical attack. Mr. Siler had not threatened Officer Torres,

Officer Torres did not see Mr. Siler armed with a weapon, and Mr. Siler had not made any movements toward Officer Torres. Accordingly, Mr. Siler's movement, and the inferences to be drawn therefrom, is critical to whether a reasonable officer in Torres's shoes would perceive Siler as posing a threat of death or serious physical injury such that the use of deadly force was objectively reasonable. The nature and characterization of that movement is genuinely disputed.

The disputed nature of Mr. Siler's movement toward the front of the SUV distinguishes this case from *Clayton*[7] and *Romero*,[8] two out-of-circuit cases finding no constitutional violation in arguably (according to Officer Torres) similar factual circumstances. In both of those cases, an officer used deadly force against an individual suspected of committing a felony after the suspect refused the officer's orders and continued to move toward the officer despite repeated commands to stop. During the entire encounter at issue here, however, Mr. Siler took only one step that could be perceived as "toward" Officer Torres. Whether that step was sufficient to create a reasonable threat given the totality of the circumstances facing Officer Torres is a factual issue that must be resolved by the ultimate trier of fact, not the Court at the summary-judgment stage.[9]

---

[7] *Clayton v. Columbia Cas. Co.*, Civil Action No. 11-845 Section I, 2012 U.S. Dist. LEXIS 164072 (M.D. La. Nov. 16, 2012).

[8] *Romero v. City of Grapevine*, 888 F.3d 170 (5th Cir. 2018).

[9] It bears noting that this is an exceptionally close call. The Court's view is that, based on the totality of the circumstances, Officer Torres acted reasonably in shooting Mr. Siler. But the Court cannot rule out the possibility that a reasonable jury might take the contrary view.

### B.  Qualified immunity

"Qualified immunity shields a government official from liability for civil damages unless his or her conduct violates a clearly established principle or constitutional right of which a reasonable person would have known at the time." *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Sanville v. McCaughtry*, 266 F.3d 724, 732 (7th Cir. 2011)). The plaintiff has the burden of defeating the qualified-immunity defense once it is raised. *Archer v. Chisholm*, 870 F.3d 603, 613 (7th Cir. 2017) (citing *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013)).

> To do so, the plaintiff must show (1) that the defendant violated a
> constitutional right, when construing the facts in the light most
> favorable to the plaintiff, and (2) that the right was clearly established
> at the time of the alleged violation, such that it would have been clear
> to a reasonable actor that her conduct was unlawful.

*Archer*, 870 F.3d at 613 (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "A failure to show either is fatal for the plaintiff's case." *Archer*, 870 F.3d at 613 (citing *Pearson*, 555 U.S. at 236).

"The first question is one of law." *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009). The second requires the plaintiff to show "that there is 'a clearly analogous case establishing a right to be free from the specific conduct at issue' or that 'the conduct is so egregious that no reasonable person could have believed that it would not violate clearly established rights.'" *Id.* (quoting *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001)). "When the qualified immunity inquiry cannot be disentangled from disputed facts, the issue cannot be resolved without a

trial." *Gonzalez*, 578 F.3d at 540 (citing *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996)).

### 1. Waiver

The plaintiffs first argue that Officer Torres has waived his claim to qualified immunity for summary-judgment purposes because his discussion of the issue was perfunctory and undeveloped. *See* Pls.' Mem. 27–28. The Court disagrees. The inevitably of Officer Torres claiming qualified immunity has been apparent from the very beginning of this case. *See* Defendants' Answer, Affirmative Defenses and Jury Demand 91, ECF No. 11; *see also* Minute Sheet for Telephonic Rule 16 Scheduling Conference, ECF No. 16; Minute Sheet for Telephonic Motion Hearing, ECF No. 24. Indeed, in exchange for bifurcating the claims against the City, the defendants agreed to delay seeking appellate review of an unfavorable qualified-immunity ruling. *See* Ct. Mins., ECF No. 24 at 2–3. Once raised, the burden shifted to the plaintiffs to defeat the qualified-immunity defense.

Moreover, Officer Torres accurately recited the qualified-immunity standard in his summary-judgment brief and provided a sufficient factual basis to support its applicability here. *See Davis v. Carter*, 452 F.3d 686, 691–92 (7th Cir. 2006) (finding no waiver despite the plaintiff not citing relevant legal authority because "she provided well-reasoned factual arguments supported by citations to the record"). That discussion clearly provided the plaintiffs adequate notice and caused them no prejudice, as the plaintiffs devoted more than eight pages of their summary-judgment response to Officer Torres's qualified-immunity argument. *See Hernandez*

*v. Cook County Sheriff's Office*, 634 F.3d 906, 913–14 (7th Cir. 2011) (finding no waiver where the defendants raised the qualified-immunity defense "at every significant stage of . . . litigation" and the plaintiffs devoted four pages of their summary-judgment response to discussing the defendants' allegedly deficient argument"). There simply was no waiver.

### 2. Violation of a constitutional right

With respect to the first prong of the qualified-immunity analysis, the factual dispute concerning Mr. Siler's movement toward the front of the SUV precludes finding that the plaintiffs have failed to assert a constitutional violation. Mr. Siler did not threaten Officer Torres, Officer Torres did not observe Mr. Siler with a weapon, and Mr. Siler had not made any other movements toward Officer Torres. Accordingly, when viewed in the light most favorable to the plaintiffs, the facts at this stage do not establish that Officer Torres did not violate Mr. Siler's right to be free from deadly force.

### 3. Clearly established law

Turning to the second prong, the plaintiffs first argue that the dispute over whether Officer Torres reasonably believed that Mr. Siler was moving toward him to attack precludes a determination of whether Siler's constitutional rights were clearly established when Torres shot and killed him. *See* Pls.' Mem. 28–29 (citing *Estate of Heenan v. City of Madison*, 111 F. Supp. 3d 929, 948 (W.D. Wis. 2015)). The plaintiffs rely on the general principles of law set forth by the Supreme Court in *Tennessee v. Garner* and *Graham v. Connor*: "that a person has a constitutional

right not to be shot unless an officer reasonably believes that he poses a threat to the officer or someone else," *Weinmann v. McClone*, 787 F.3d 444, 450 (7th Cir. 2015). However, "the Supreme Court has cautioned lower courts 'not to define clearly established law at a high level of generality.'" *Mason-Funk v. City of Neenah*, 895 F.3d 504, 508 (7th Cir. 2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). The Supreme Court also "has made clear that '*Garner* and *Graham* do not by themselves create clearly established law outside an obvious case.'" *Mason-Funk*, 895 F.3d at 508 (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018)).

The plaintiffs argue that this is an obvious case because "[w]hen Torres started shooting, all [Siler] did was take a step to the right while still on the other side of an SUV that Torres was using for cover." Pls.' Mem. 30. This argument ignores the totality of circumstances facing Officer Torres. It is undisputed that at the time of the shooting: (1) Officer Torres believed that Mr. Siler was wanted for strangulation and suffocation; (2) Mr. Siler recklessly fled from Officer Torres's attempted traffic stop; (3) Mr. Siler repeatedly disregarded Officer Torres's lawful commands during the foot chase and while inside the auto body shop; (4) Mr. Siler bent down and appeared to be grabbing something from the shop's floor; and (5) Mr. Siler took a step toward the front of the SUV and away from the open garage door. Given those facts, the Court cannot say that it was obvious that Mr. Siler did not present an imminent danger when Officer Torres used deadly force; indeed, denying Officer Torres summary judgment on the plaintiffs' excessive-force claim was a very close call. Accordingly, to defeat qualified immunity in this case, the plaintiffs must

point to a more "particularized" clearly established right. *See Thompson v. Cope*, 900 F.3d 414, 421–22 (7th Cir. 2018).

The plaintiffs have presented three cases that, in their view, provided Officer Torres sufficient notice that his decision to use deadly force against Mr. Siler was unreasonable. However, those cases are not sufficiently analogous to govern the facts and circumstances that confronted Officer Torres.

*Tennessee v. Garner*

At about 10:45 p.m. on October 3, 1974, officers from the Memphis Police Department were dispatched to a residential burglary in progress. *Garner*, 471 U.S. at 3. After arriving at the scene, one of the officers cornered the fleeing suspect against a backyard fence. *Id.* The officer had no articulable basis to believe the suspect was armed and observed the suspect to be young (about 17 or 18) and slight of build (about 5′5″ or 5′7″ tall). *Id.* at 3–4. When the suspect ignored the officer's commands to halt and started to climb over the fence to escape, the officer shot him in the back of the head. *Id.* at 4. The Supreme Court determined that the officer's use of deadly force in those circumstances was objectively unreasonable because the officer "did not have probable cause to believe that [the suspect] . . . posed any physical danger to himself or others." *Id.* at 21.

*Garner* is plainly inapposite. Here, Officer Torres had reason to believe that Mr. Siler had committed a violent felony. He also had an articulable basis for believing that Mr. Siler was attempting to arm himself with whatever he could find on the repair shop's floor. And most importantly, Officer Torres did not shoot Mr.

Siler in the back while he was attempting to flee. Rather, Mr. Siler was shot when he moved toward the front of the SUV and away from his means of escape, the open garage door.

*McKinney v. Duplain*

At approximately 3:26 a.m. on a Saturday night near the campus of Ball State University, a woman called 911 to report a large man banging on her back-patio door and attempting to enter her home. *See McKinney*, 463 F.3d at 680–81. Officers from the Ball State Police Department responded to the call, and one of the officers encountered the suspect in the woman's backyard standing under a tree about ten to twenty feet away. *Id.* at 681–82. According to the officer and a few neighbors who witnessed the incident, the suspect ignored the officer's commands to get on the ground, turned toward the officer, and suddenly charged. *Id.* at 682. When the suspect came within a few feet of him, the officer fired his service weapon four times, killing the suspect.

The suspect's estate filed an excessive-force case against the officer, who moved for summary judgment based on qualified immunity. *Id.* at 680. The district court denied the motion, finding that genuine issues of material fact existed, including whether the suspect had charged at the officer. *Id.* at 683. Based on expert testimony, the estate had argued that the suspect was shot twice from the back-left side while he was standing still and two more times while he was falling to the ground. On appeal, the Seventh Circuit dismissed the case for lack of jurisdiction. *Id.* at 693. The court determined that Supreme Court precedent

precluded review of "the district court's conclusion that a genuine factual dispute exists." *Id.* (relying on *Johnson v. Jones*, 515 U.S. 304 (1995)).

Because the officer's appeal was dismissed for lack of jurisdiction, and not on the merits of the qualified-immunity issue, *McKinney* did not clearly establish any constitutional rights. And even if it did, the facts of this case are materially dissimilar. The plaintiffs have not offered any evidence to suggest that Mr. Siler was shot while standing still, in the back, or while falling to the ground.[10] Also, in contrast to the officer in *McKinney*, at the time of the shooting, Officer Torres was aware that Mr. Siler had engaged in violent and reckless behavior.

*Ellis v. Wynalda*

At approximately 7:00 a.m. on September 7, 1986, an individual broke into an Indianapolis pharmacy and stole drugs and money. *See Ellis v. Wynalda*, 999 F.2d 243, 245 (7th Cir. 1993). An officer responded to the tripped burglar alarm and observed a suspect walking out the back door of a vacant store adjacent to the pharmacy. The suspect kept walking as the officer approached and ordered him to stop. When the officer told him to stop a second time, the suspect turned, lofted his jacket and mesh beg toward the officer, and ran away. The officer then shot the fleeing suspect once in the lower back.

The district court granted the officer qualified immunity from the suspect's excessive-force claim, but the Seventh Circuit reversed. *Id.* The court reasoned,

---

[10] The medical examiner merely surmised that Mr. Siler "may have been falling, leaning, or running at the time of the three guns shots to the chest," given their downward trajectory. *See* Declaration of Brian Peterson ¶ 12, ECF No. 59.

"When an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity." *Id.* at 247. Thus, while the officer may have been justified in shooting the suspect as he tossed the bag or just after the bag hit him, it was unreasonable to use deadly force after the bag had landed on the ground and the suspect had started to run away. At that moment, the officer had no reason to believe that the suspect "presented a threat of serious harm to the officer or others." *Id.* at 247.

According to the plaintiffs, *Ellis* clearly established that Officer Torres violated Mr. Siler's constitutional rights when he fired three fatal shots to Siler's chest after he was already falling backwards to the ground. Pls.' Mem. 33–34. The plaintiffs, however, have no evidence to support this view of the facts. The medical examiner's opinion that Mr. Siler may have been falling at the time he was shot in the chest does not establish that Siler was indeed falling backwards. Likewise, the plaintiffs' expert testimony that the shots to the chest were the fatal shots is of little value given the lack of evidence regarding the order of the shots.

* * * * *

Collectively, *Garner*, *McKinney*, and *Ellis* stand for the unremarkable proposition that an officer cannot, consistent with the Fourth Amendment, use deadly force against a suspect who is standing still or fleeing if the officer has no reason to believe that the suspect poses an imminent danger. In this case, even when viewed in the light most favorable to the plaintiffs, the facts do not establish that Mr. Siler was standing still or fleeing at the time he was shot. Rather, the

undisputed facts demonstrate that Mr. Siler had taken a step toward the front of the SUV (and away from an open garage door) after refusing Officer Torres's commands to get on the ground and after bending down and reaching for something. It was not clearly established in March 2015 that an officer's use of deadly force under similar circumstances was objectively unreasonable. *See Thompson*, 900 F.3d at 421–23 (explaining that the clearly established right should not be defined too broadly or narrowly, "but just right") (citation omitted).

## V.     Conclusion

For all the foregoing reasons, the Court finds that Officer Torres is entitled to qualified immunity from the plaintiffs' excessive-force claim. Officer Torres's motion for summary judgment will therefore be granted.

**NOW, THEREFORE, IT IS HEREBY ORDERED** that Defendant Paul Torres' Summary Judgment Motion, ECF No. 45, is **GRANTED**.

Dated at Milwaukee, Wisconsin, this <u>19th</u> day of February, 2019.

**BY THE COURT:**

*s/ David E. Jones*
DAVID E. JONES
United States Magistrate Judge